**Gladys G. HOLLOWAY et al., Appellants,**

**v.**

**BRISTOL–MYERS CORPORATION.**

**No. 71–1479.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 20, 1972.

Decided July 26, 1973.

Rehearing Denied Nov. 7, 1973.

---

Karen W. Ferguson, Chicago, Ill., for appellants.

Gilbert H. Weil, New York City, with whom William G. Greif, Washington, D. C., was on the brief, for appellee.

Before LEVENTHAL, ROBINSON and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

The central ruling in this case holds that private actions to vindicate rights asserted under the Federal Trade Commission Act may not be maintained.

Claiming to represent the interests of the consuming public and advertising audience,[1] the appellants brought this class action against Bristol-Myers Corporation, the manufacturer of *Excedrin,* a widely sold non-prescription analgesic compound. They allege in essence that

---

1. The complaint is framed in terms of three classes: (1) those persons who were induced to purchase *Excedrin* in reliance upon Bristol-Myers' advertising representations; (2) those members of the advertising audience "who desire not to be subjected to false, misleading and deceptive advertisements"; and (3) those consumers and purchasers of analgesics who purportedly are being and will be misled unless dissemination of Bristol-Myers' advertisements is restrained. The first two classes are represented by named individuals. Two consumer protection organizations, claiming to act on behalf of their members, represent the third class. The District Court found reason to question the standing of the nominal plaintiffs to represent these classes. Holloway v. Bristol-Myers Corp., 327 F.Supp. 17, 23–24 (D.D.C., 1971), citing Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). We find it unnecessary either to explore this matter or to distinguish between the various classes, which will, for purposes of this opinion, be treated as having interests that merge.

Bristol-Myers' representations in a variety of advertisements—that *Excedrin* is and has been shown to be a more effective pain relieving agent than common aspirin—are false, deceptive and materially misleading; and that, in reliance upon them, persons have been and will be induced to purchase *Excedrin* in preference to other, equally effective and less expensive analgesics, to their pecuniary loss.

The complaint was grounded on three basic theories: a statutory action based on sections 5, 12 and 14 of the Federal Trade Commission Act (hereafter "Act"), as amended, 15 U.S.C. §§ 45, 52 and 54; a common law action for deceit; and an equitable claim that appellee's advertisements constitute a public nuisance. Appellants sought declaratory and injunctive relief, together with damages, both compensatory and punitive.

The District Court dismissed appellants' statutory and equitable claims for failure to state a claim upon which relief could be granted [2] and their common law claims for want of jurisdictional amount. We affirm.

### A. Broad Overview of the Issue of Private Actions to Enforce the Federal Trade Commission Act

■ The central question is whether consumers and members of the public at large may bring a private action to enforce §§ 5, 12 and 14 of the Act, as amended, which prohibit "unfair or deceptive acts or practices in commerce" (§ 5(a)),[3] including "any false advertisement . . . which is likely to induce, directly or indirectly the purchase of . . . drugs" (§ 12(a)(1)),[4] violations of which are misdemeanors if made "with intent to defraud or mislead" (§ 14(a)).[5] The issue has been much discussed by scholars.[6] We join in the analysis of the well-reasoned opinion of Judge Jones, that an action of this nature may not be maintained Holloway v. Bristol-Myers Corp., 327 F.Supp. 17 (D.D.C., 1971). We add our opinion primarily to enlarge on the well-nigh dispositive history and structure of the legislation, and in part to amplify and redefine the core analysis.

The Act nowhere purports to confer upon private individuals, either consum-

2. Appellants seize on certain language in the District Court's opinion to characterize it as a dismissal for want of subject matter jurisdiction. We do not read it thus.

Under 28 U.S.C. § 1337, the district courts are given

original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

Plainly, this language applies to the Federal Trade Commission Act. Such jurisdiction lies without regard to the amount in controversy, or the citizenship of the parties. *See* Peyton v. Railway Express Agency, Inc., 316 U.S. 350, 62 S.Ct. 1171, 86 L.Ed. 1525 (1942); Bloomfield S.S. Co. v. Sabine Pilots Ass'n, 262 F.2d 345 (5th Cir., 1959), cert. dismissed, 368 U.S. 802, 82 S.Ct. 20, 7 L.Ed.2d 15 (1961).

Although, as will appear, we hold that the Act does not ground a private action, appellants' invocation of the Act in support of a claim that is not plainly insubstantial or frivolous on its face suf-

fices as an invocation of § 1337 jurisdiction. The District Court so held, and properly so. *See* Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

3. 15 U.S.C. § 45(a).

4. 15 U.S.C. § 52(a)(1).

5. 15 U.S.C. § 54(a).

6. *E. g.*, Lovett, Private Actions for Deceptive Trade Practices, 23 Admin.L. Rev. 271 (1971); Comment, Private Remedies Under the Consumer Frauds Acts: The Judicial Approaches of Statutory Interpretation and Implication, 67 N.W.U.L.Rev. 413 (1972).

For general discussion of private remedies to implement Federal legislation, see, *e. g.*, H. Hart & H. Wechsler, The Federal Courts and the Federal System 798–806 (2d ed., 1973); Note, Implying Civil Remedies from Federal Regulatory Statutes, 77 Harv.L.Rev. 285 (1963); Comment, Federal Jurisdiction in Suits for Damages Under Statutes not Affording Such Remedy, 48 Colum.L.Rev. 1090 (1948).

ers or business competitors, a right of action to enjoin the practices prohibited by the Act or to obtain damages following the commission of such acts. On careful examination of the Act and its legislative history, both when passed in 1914 and amended in 1938, we find strong indication that Congress did not contemplate or intend such a private right of action.

Appellants contend that the courts should, by implication of law, recognize and entertain such an action as a necessary adjunct to the enforcement of the statute's prohibitions.

Appellants point to numerous instances in which civil remedies have been implied as judicially-fashioned corollaries to various Federal regulatory statutes.[7] The opinion of Judge Jones analyzes a number of these precedents, including particularly the leading case of J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). In broad outline, the rationale for implying a private right of action rests upon: (1) a Federal statutory or constitutional prohibition against the acts complained of; (2) inclusion of the defendant in the class upon which the duty of statutory compliance has been imposed; (3) legislative intent to place the party claiming injury within the ambit of the statute's protection or to confer a substantive benefit or immunity upon him; (4) injury or threatened harm proximately resulting from the defendant's

breach of duty; and (5) unavailability or ineffectiveness of alternative avenues of redress.

These factors are necessary but not sufficient conditions, and their combined presence does not automatically warrant the implication of a private right of action. The core of our decision rejecting implication of a private action lies in our analysis of the ramifications of the asserted private remedy and a comparison of these with the policies and objectives sought to be advanced by Congress.[8] This analysis is conjoined with a further discussion of factors (3) and (5), legislative intent and ineffectiveness of the means provided by Congress for effectuating its objective.

Judicial implication of ancillary Federal remedies is a matter to be treated with care, lest a carefully erected legislative scheme—often the result of a delicate balance of Federal and state, public and private interests—be skewed by the courts, albeit inadvertently. This caution is especially apposite in situations where, as here, the substantive prohibitions of the statute are inextricably intertwined with provisions defining the powers and duties of a specialized administrative body charged with its enforcement[9] and where Congress has superimposed a structure of Federal law upon the existing system of common law remedies for fraud and deceit without preempting or superseding the latter.

7. *E. g.*, Wyandotte Transp. Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967) (action by the United States under the Rivers and Harbors Act of 1899); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (Securities and Exchange Act of 1934); Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) and Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944) (Railway Labor Act); Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S. Ct. 229, 85 L.Ed. 189 (1940) (Securities Act of 1933); Gomez v. Florida State

Employment Serv., 417 F.2d 569 (5th Cir., 1969) (Wagner-Peyser Act); Fitzgerald v. Pan American World Airways, 229 F.2d 499 (2d Cir., 1956) (Civil Aeronautics Act of 1938); Reitmeister v. Reitmeister, 162 F.2d 691 (2d Cir., 1947) (Communications Act of 1934).

8. *See, e. g.*, T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L. Ed.2d 952 (1959); Steele v. Louisville & Nashville R.R. Co., *supra*.

9. *See* T.I.M.E., Inc. v. United States, *supra*; Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

## B. *The 1914 Statute*

The Federal Trade Commission was created in 1914 as part of a two-pronged effort by Congress to improve enforcement of the anti-trust laws.[10] One branch of this program consisted of specifically prohibiting certain types of conduct—*i. e.*: price discrimination, price fixing, exclusive dealing, anti-competitive mergers and acquisitions, and interlocking directorates—that tended to encourage the formation of monopolies. These detailed prohibitions were set forth in the Clayton Act, 15 U.S.C. §§ 12–27, which became law on October 15, 1914. In this area, Congress provided a maximum of enforcement authority: criminal penalties, *see* 15 U.S.C. § 24; actions brought by the Justice Department to enjoin violations, *see* 15 U.S.C. § 25; authorization to the FTC and certain other agencies to issue cease and desist orders to restrain violations by enterprises subject to their respective jurisdictions, *see* 15 U.S.C. § 21. In addition, the Clayton Act expressly authorized private actions, both for treble damages and equitable relief, by any "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U. S.C. §§ 15, 26, and provided that judgments obtained by the United States against the same defendant shall be prima facie evidence of a statutory violation in any subsequent private litigation, *see* 15 U.S.C. § 16.

Congress recognized, however, that any attempt at an exhaustive catalogue of anti-competitive practices would only tempt those bent upon thwarting or circumventing the anti-trust laws to adopt new and different artifices to achieve the same ends.[11] The legislature felt, moreover, that there was need for action of an early, preventive nature, to strike down devices and schemes in their incipiency, before they became entrenched in structure and industrial concentration.[12] These factors suggested a statute whose prohibitions were couched in broad, generic terms, permitting application in a wide variety of commercial contexts and coping with evasive tactics. Yet this breadth of prohibition carried with it a danger that the statute might become a source of vexatious litigation. Expertise was called for,[13] both to identify trade practices that posed the threat of monopoly and to avoid using the statute as a vehicle for trivial or frivolous claims. There was, furthermore, a need to develop a central and coherent body of precedent, construing and applying the statute in a wide range of factual contexts, so as to define its operative reach.[14] Finally, it would be of assistance to create a specialized forum where businessmen whose methods had been called into question could voluntarily revise their practices without the need to resort to the courts.[15] It was in response to these needs that, on September 26, 1914, Congress passed the Federal Trade Commission Act and established the Federal Trade Commission.

As enacted in 1914,[16] section 5(a) of this Act provided:

> Unfair methods of competition in commerce are hereby declared unlawful.

10. See generally, G. Henderson, The Federal Trade Commission: A Study in Administrative Law and Procedure (1924).

11. *See* S.Rep.No.597, 63d Cong., 2d Sess., at 13 (1914); H.R.Rep.No.1142, 63d Cong., 2d Sess., at 19 (1914) (Conference Report); G. Henderson, *supra*, at 33–36.

12. *See* H.R.Rep.No.533, 63d Cong., 2d Sess., at 4–6 (1914); S.Rep.No.597, *supra*, at 12–13; H.R.Rep.No.1143, *supra*, at 18–19.

13. *See* S.Rep.No.597, *supra*, at 8–11; H.R.Rep.No.1142, *supra*, at 19; G. Henderson, *supra*, at 92, 98.

14. *See* G. Henderson, *supra*, at 48. *Cf. id.* at 36–38.

15. *See* S.Rep.No.597, *supra*, at 6–7, quoting Presidential Message of January 20, 1914; G. Henderson, *supra*, at 21–22.

16. 38 Stat. 717 et seq. (1914).

The [Federal Trade] Commission is hereby empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in commerce.

These two paragraphs follow immediately upon one another, both in the same enumerated subsection. The Act continued, § 5(b):

Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair methods of competition in commerce, and *if it shall appear to the Commission* that a proceeding by it in respect thereof would be in the interest of the public, it shall serve upon such person, partnership, or corporation a complaint . . . . (emphasis supplied)

The statute went on to detail a procedure whereby the FTC, following notice and hearing, might enter an order directing the respondent to cease and desist from the practice complained of and was empowered to seek enforcement of its order in an appropriate Court of Appeals.

Although the Federal Trade Commission Act and the Clayton Act were coordinate statutes, both furthering the same general objective of avoiding monopoly and concentrations, different means of implementation were selected by Congress, each uniquely geared to the substantive prohibitions of the respective acts.[17] The focus of the Trade Commission Act was a highly specialized administrative body to which Congress delegated a wide range of visitorial powers in the field of potentially anti-competitive trade practices. Whereas the Clayton Act, with its relatively specific prohibitions, was accompanied by a broad range of enforcement devices, including private actions, the Federal Trade Commission Act, with its broadly framed proscription, was intended to be the exclusive domain of the specialized agency expressly charged with its enforcement and created for that purpose. The Commission was entrusted with a broad responsibility and discretion, prosecutorial in part, judicial in part (to enter orders of restraint), linked and subject to a determination that cease and desist proceedings and orders would further the public interest.[18] As the Supreme Court declared: "Section 5 . . . does not provide private persons with an administrative remedy for private wrongs."[19] Private persons were given no right to file a complaint, and the only participation by private interests that was contemplated was that of intervention, on leave and a showing of good cause, as set forth in § 5(b):

Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission, to intervene and appear in [a cease and desist] proceeding by counsel or in person.

Finally, in 1926 the Court gave short shrift to the effort of a private party to append a claim of "unfair methods of competition" under § 5 to an anti-trust complaint, and held that such relief "must be afforded in the first instance

---

17. *See* New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co., 332 F.2d 346, 350–352 (3d Cir., 1964) (dictum), aff'd 381 U.S. 311, 85 S.Ct. 1473, 14 L. Ed.2d 405 (1965).

18. *See* § 5(b), quoted in text, *supra* (as amended, 15 U.S.C. § 45(b)). In FTC v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138 (1929), the Supreme Court stressed the centrality of the Commission's public interest determination. Although the FTC "exercises a broad discretion . . ., [t]o justify filing a complaint the public interest must be specific and substantial." (*Id.* at 28, 50 S.Ct. at 4). This emphasis on the Commission's role as both guardian and spokesman of the public interest has unquestioned vitality. *See, e. g.*, Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, n. 4 at 211–212, 79 S.Ct. 705, 3 L.Ed. 2d 741 (1959).

19. FTC v. Klesner, *supra*, 280 U.S. at 25–26, 50 S.Ct. at 3.

by the [C]ommission." Moore v. New York Cotton Exchange.[20]

## C. *The Wheeler-Lea Amendments of 1938*

■ We now consider whether the 1914 preclusion of private actions was altered by subsequent amendments to the Act.

In the course of enforcing the 1914 Act, the FTC became aware that deceptive advertising posed a substantial threat to free competition, by diverting trade to those who used such methods in the hope of securing a trade monopoly. The Commission began several proceedings and issued cease and desist orders, upheld in a series of notable decisions, that false labeling and dishonest merchandising and advertising techniques constituted "unfair methods of competition in commerce" within the meaning of § 5.[21]

However, an impediment to FTC jurisdiction and enforcement arose in the form of a judicial decision interpreting "methods of competition" to require that the FTC demonstrate the fact of injury to a competitor as a condition to section 5 proceedings. FTC v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931). Not only did this complicate problems of proof and increase the cost of proceedings, but it reportedly served to stifle enforcement of the Act in industries where competition was virtually non-existent or where all members of the trade used equally reprehensible selling tactics.[22] Accordingly, the Commission sought amendatory legislation making clear the FTC's authority to pursue deceptive acts without the need to show adverse competitive impact. These recommendations were embodied in bills introduced in the 74th and 75th Congresses to add to section 5 an express and unqualified prohibition against "unfair or deceptive acts or practices in commerce." [23]

During the same period of the 1930s, Congress was engaged in a comprehensive revision of the Food and Drug laws.[24] In addition to seeking stricter control over the sale of adulterated and misbranded products intended for human consumption, sponsors of this reform legislation, led by Senator Royall S. Copeland of New York, sought to bring all advertising of food, drugs and cosmetics within the purview of the Food and Drug Administration. Legislation was proposed making the dissemination of false advertising a misdemeanor and declaring it a public nuisance, subject to restraint by District Court injunction.[25] These potent measures

20. 270 U.S. 593, 603, 46 S.Ct. 367, 368, 70 L.Ed. 750 (1929).

21. FTC v. Winsted Hoisery Co., 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729 (1922) ; FTC v. Royal Milling Co., 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706 (1933) ; FTC v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655 (1934) ; FTC v. R. F. Keppel & Bro., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934).

22. *See* S.Rep.No.221, 75th Cong., 1st Sess., at 2–3, 5 (1937) ; H.R.Rep.No.1613, 75th Cong., 1st Sess., at 2–3 (1937) ; Testimony of Commissioner Ewin L. Davis, Hearings on S. 3744 Before the House Comm. on Interstate & Foreign Commerce, 74th Cong., 2d Sess., at 7–11 (1936) ; Statement of Commissioner Davis, Hearings on S. 3744 Before the Senate Comm. on Interstate Commerce, 74th Cong., 2d Sess., at 6, 11–13 (1936) ; Testimony of Commissioner Davis and Chief Counsel William T. Kelley, Hearings on H.R. 3143 Before the House Comm. on Interstate & Foreign Commerce, 75th Cong., 1st Sess., at 3–16 (1937).

23. S. 3744, 74th Cong., 2d Sess. (1936) ; S. 1077, 75th Cong., 1st Sess. (1937) ; H.R. 3143, 75th Cong., 1st Sess. (1937). *See* S. 944, 74th Cong., 1st Sess. (1935).
Amendments were also proposed to strengthen the mechanism for enforcing FTC cease and desist orders and to expedite judicial review of Commission decisions. These were adopted and form the essence of sections 5(b)−(*l*) of the present law (as amended, 15 U.S.C. §§ 45(b)−(*l*).

24. See generally, Symposium, The New Food, Drug, and Cosmetic Legislation, 8 Law & Contemp.Prob. 1–182 (1939).

25. *See* S. 1944, 73d Cong., 1st Sess., §§ 9(a), (b), 17(a)(4), (b)−(d), 19(a), (b)

were opposed by Members of Congress, particularly in the House, and by representatives of the affected industries, who considered a standard or per se liability inappropriate for advertising claims as to which medical opinion might be divided, who favored retention of FTC jurisdiction in all fields of promotional activity, and who were mistrustful of any attempt to vest in the Food and Drug Administration and the Secretary of Agriculture broad, plenary authority to control the dissemination of advertising matter.[26] There resulted a Congressional impasse that threatened to block the passage of any reform of the Food and Drug laws.[27]

The deadlock was broken in the 75th Congress. In March 1937, the Senate passed first S. 5, to amend the Food and Drug Act so to provide FDA jurisdiction over food, drug, and cosmetic advertising,[28] and later S. 1077, to provide the amendments to the Federal Trade Commission Act that the FTC had sought.[29] Both bills were referred to the House Committee on Interstate and Foreign Commerce. As in prior Congresses,[30] the House was unwilling to accede to the advertising controls embodied in the Senate food and drug bill. Instead of merely striking the offending provisions from S. 5, the House Committee took the further step of revising these paragraphs and engrafting them onto the Trade Commission Act amendments, thus placing in the hands of the FTC exclusive control over food, drug, and cosmetic advertising.[31] This legislative amalgam, denominated the Wheeler-Lea Amendments to the Federal Trade Commission Act, passed the House in January 1938, was adopted by the Conference Committee,[32] passed the

(1933). Successor bills contained essentially the same features. *See* S. 2000, 73d Cong., 2d Sess. (1934); S. 2800, 73d Cong., 2d Sess. (1934).

These were modified somewhat in versions introduced in the 74th and 75th Congresses, which omitted the "public nuisance" characterization but nevertheless retained the injunctive procedures. *See* S. 5, 74th Cong., 1st Sess., §§ 601, 708, 712 (as introduced, Jan. 3, 1935); S. 5, 75th Cong., 1st Sess., §§ 3(4), (5), 4, 5 (as introduced, Jan. 6, 1937).

26. *Compare* S.Rep.No.361, 74th Cong., 1st Sess. 21–22 (1935) *with id.*, part 2, at 1–3, 6, 8–9 (Minority Views) (1935). *See* H.R.Rep.No. 2755, 74th Cong., 2d Sess. 7–10 (1936); Hearings on S. 1944 Before a Subcomm. of the Senate Comm. on Commerce, 73d Cong., 1st Sess. 107–08, 122–23, 156, 160, 170–72, 228–29, 240–61, 268–70, 311–12, 315–18, 330–35, 410–21, 456–58 (1933); Hearings on S. 2800 Before the Senate Comm. on Commerce, 73d Cong., 2d Sess. 194–95, 199–208, 220, 231–40, 612–14, 621–23, 636–37 (1934); 79 Cong.Rec. 4913–18, 5020–25 (1935).

27. Cavers, The Food, Drug, and Cosmetic Act of 1938: Its Legislative History and Substantive Provisions, 6 Law & Contemp.Prob. 2, 13–14, 17 (1939).

On May 28, 1935, a bill providing, *inter alia*, for FDA control over food, drug, and cosmetic advertising passed the Senate and was referred to the House Committee on Interstate and Foreign Commerce.

That Committee, responding to the widespread criticism of the Senate bill, deleted the provisions relating to advertising and substituted a measure whereby all advertising was to be the exclusive province of the Federal Trade Commission. This action was taken over the dissenting votes of three Committee members who argued that the FTC's cease and desist order procedures would be ineffective in dealing with patent medicine advertising. *See* H.R.Rep.No.2755, 74th Cong., 2d Sess. (1936). So amended, the measure passed the House. But efforts to harmonize the Senate and House versions of the bill were unsuccessful and the Congress expired before the Conference Committee could engineer a satisfactory compromise. *See* Cavers, *supra*, at 17.

28. Although certain minor amendments had been made by the Senate Commerce Committee, this bill was essentially a reintroduction—with the same bill number—of the Senate bill introduced in the 74th Congress. *See id.* at 18; S.Rep.Nos.91, at 3–4, and 152, at 3–4, 75th Cong., 1st Sess. (1937).

29. *See* S.Rep.No.221, 75th Cong., 1st Sess. (1937). *See also* notes 22–23 *supra* and accompanying text.

30. See note 27 *supra*.

31. *See* H.R.Rep.No.1613, 75th Cong., 1st Sess. (1937).

32. H.R.Rep.No.1774, 75th Cong., 3d Sess. (1938) (Conference Report).

Senate, and was signed into law by President Roosevelt on March 21, 1938.[33] Thereafter, shorn of the one-time impediment of the controversial advertising provisions, the Food, Drug, and Cosmetic Act became law on June 25, 1938.[34]

The resulting amendments to the Federal Trade Commission Act contain six provisions relating to advertising.[35] The first of these embodied the general modification of § 5 which the FTC had sponsored in its effort to overrule the *Raladam* case.[36] The remaining five provisions, dealing expressly with food, drug and cosmetic advertising, were transplanted from the Senate's Food and Drug bill. Section 12 [37] made unlawful the dissemination of false advertising for any food, drug, or cosmetic, and declared it an "unfair or deceptive act or practice" within the meaning of § 5. Supplemental means to enforce § 12 were provided. Section 13 gave the FTC authority to seek temporary injunctions to restrain violations of § 12 while cease and desist proceedings were pending.[38] Under § 14 violations of § 12 that were willful or committed in connection with the sale of injurious products were made punishable as misdemeanors.[39] Under § 5(*l*) the United States was authorized to recover a civil penalty from any defendant who violated a final FTC cease and desist order.[40] But under § 16, these punitive measures were conditioned upon FTC certification to the Attorney General of probable liability.[41] Finally, a definitional section, § 15, paralleled the definitions in the Food, Drug and Cosmetic Act.[42]

The reasons why Congress chose the FTC Act, rather than the Food, Drug, and Cosmetic Act, as the vehicle for regulating the advertising of medicinal products are amply documented in the committee reports.[43] The various alternative forms of regulation were the subject of extensive—and sometimes acrimonious—floor debate.[44]

■ The Wheeler-Lea Amendments represented a shift in emphasis, from the control of deceptive advertising practices as an incident of antitrust regulation to the avowed purpose of protecting the consumer from fraud.[45] But

---

33. 52 Stat. 111 (1938).

34. 52 Stat. 1040 (1938). *See* Cavers, *supra* note 27, at 17–22.

35. See generally Handler, The Control of False Advertising Under the Wheeler-Lea Act, 6 Law & Contemp.Prob. 91–110 (1939).

36. See notes 22–23 *supra* and accompanying text. Further amendments, not relevant to this case, have since been made to § 5; and it presently appears as 15 U.S.C. § 45.

37. *See* 15 U.S.C. § 52.

38. *See* 15 U.S.C. § 53.

39. *See* 15 U.S.C. § 54.

40. *See* 15 U.S.C. § 45(*l*).

41. *See* 15 U.S.C. § 56.
In United States v. Saint Regis Paper Co., 355 F.2d 688 (2d Cir., 1966), the Attorney General brought suit to recover a § 5(*l*) civil penalty for violation of an outstanding FTC cease and desist order without having previously obtained Trade Commission certification under § 16. After considering the overall enforcement scheme of the Act and its legislative history, the court concluded that § 16 was a jurisdictional requisite and dismissed the complaint.

42. *See* 15 U.S.C. § 55. *Cf.* 21 U.S.C. § 321 (Food, Drug & Cosmetic Act).

43. H.R.Rep.No.1613, 75th Cong., 1st Sess. (1937); S.Rep.No.221, 75th Cong., 1st Sess. (1937); H.R.Rep.No.1774, 75th Cong., 3d Sess. (1938). *See also* reports cited in note 26 *supra*.

44. *See, e. g.*, 83 Cong.Rec. 391–425, 3287–93 (1938).

45. H.R.Rep.No.1613, 75th Cong., 1st Sess., at 3 (1937);
By the proposed amendment to section 5, the Commission can prevent such acts or practices which injuriously affect the general public as well as those which are unfair to competitors. In other words, this amendment makes the consumer, who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor.

in moving to achieve this goal Congress deliberately chose to entrust the regulation of advertising to an existing body, the Federal Trade Commission, whose methods and procedures were familiar and well established. Although the Wheeler-Lea Amendments extended the Commission's authority and added sanctions to its arsenal, Congress plainly intended these augmented powers to be exercised within the institutional matrix created by the 1914 Act.[46] Indicative of this fundamental policy judgment are frequent references in the legislative history to the Trade Commission's expertise in dealing with commercial practices, its ability to act as a buffer in securing voluntary compliance through informal proceedings, and its sound discretion in determining when formal enforcement measures were necessary.[47] Congress voiced approval of the Commission's record in shaping the fluid contours of generalized statutory policy pronouncements into meaningful and coherent rules of business conduct, and it felt that the agency's experience in making concrete the proscriptions of the 1914 Act against "unfair methods of competition" rendered the FTC particularly well suited to the responsibility of giving life to the broad standard of "de-

S.Rep.No.221, 75th Cong., 1st Sess., at 2 (1937) :

> The inevitably sound conclusion is that where it is not a question of a purely private controversy, and where the acts and practices are unfair or deceptive to the public generally, they should be stopped regardless of their effect on competitors. This is the sole purpose and effect of the chief amendment to section 5.

46. Remarks of Senator Wheeler, 83 Cong. Rec. 3256 (1938) :

> The legislation establishes no new bureaus and no new fields of activity for the Commission but provides more effective methods of accomplishing the purposes of the existing law [the 1914 Act].

Remarks of Rep. Reece, one of the managers of the Wheeler-Lea bill in the House of Representatives, 83 Cong.Rec. 399 (1938) :

> The Federal Trade Commission since its inception has been charged with the responsibility of enforcing the false-advertising provisions of the [1914] law. This bill [the Wheeler-Lea Amendments] simply strengthens present law to enable the Commission to enforce the law effectively as it relates to food, drugs, devices and cosmetics when injury to health is involved or where there is an intent to defraud the public.

See H.R.Rep.No.1613, 75th Cong., 1st Sess., at 1 (1937).

47. H.R.Rep.No.1613, 75th Cong., 1st Sess., at 5 (1937) :

> The Federal Trade Commission has the machinery and trained personnel to investigate in a proceeding against false advertising of all industries and all commodities. The common motive of false advertisement is the same in every line of industry, to gain an economic advantage through defrauding or misleading the purchaser. This method of protecting the public should be harmonized and unified under one organization with consistent and uniform methods of enforcement and penalization. Efficiency, uniformity, and economy suggest this course. This legislation is framed with that purpose in mind.

> The Federal Trade Commission as an independent quasi-judicial body, has a procedure better calculated to handle multitudinous types of advertising and to do its work to the greater confidence and satisfaction of the public than any purely administrative body. Its work carries with it the combined elements of searching investigation, orderly procedure, prevention rather than penalization in minor cases, and that judicial fairness that is essential to the enlistment of confidence by the public.

Remarks of Rep. Wolverton, a manager of the Wheeler-Lea bill before the House, 83 Cong.Rec. 396 (1938) :

> The bill . . . contemplates that all the various types and degrees of offenders under the broad and general definitions used in the bill could not justly be considered in the same class. Therefore, different procedures and penalties are provided in the act. *Discretion is given to the Commission.* For the trivial offenders, as well as those where no real law offending purpose is discernible, the Commission may issue a cease-and-desist order. In cases where the offender is persistent the Commission may proceed by injunction process and thereby prevent a continuance of the offense . . . (emphasis supplied).

**996**

ceptiveness" as applied to advertising.[48] Until such an administrative refinement of definition could take place, Congress pointedly rejected any effort to hold business accountable to judicially imposed liability.[49]

---

48. H.R.Rep.No.1613, 75th Cong., 1st Sess. at 5 (1937):

> The definition is broad enough to cover every form of advertisement deception over which it would be humanly practicable to exercise governmental control. It covers every case of imposition on a purchaser for which there could be a practical remedy. It reaches every case from that of inadvertent or uniformed [sic] advertising to that of the most subtle as well as the most vicious types of advertisement.
>
> Obviously, a definition to be applied to the infinite variety of advertisements disseminated regarding thousands of different foods, drugs, devices, and cosmetics must be general in its terms. There will be difficulties and uncertainties of interpretation just as there have been in the case of provisions of the Federal Trade Commission Act, the Food and Drug Act, and the antitrust laws, and other laws prescribing in general terms standards of conduct to be applied to innumerable factual situations. These difficulties are inherent in the problem but should not prevent necessary and adequate consumer protection.

Remarks of Rep. Lea, co-sponsor of the Wheeler-Lea Amendment, 83 Cong.Rec. 392 (1938):

> We have, therefore, the question of applying the remedies to a definition very broad in its terms. The procedure of the Federal Trade Commission . . . is well calculated to discriminate between the various classes of offense against this section [§ 12] without injustice.

See Hearings on H.R.3143 Before the House Comm. on Interstate & Foreign Commerce, 75th Cong., 1st Sess., at 46–47 (Remarks of Rep. Martin & Chairman Lea) (1937); Hearings on S. 3744 Before the Senate Comm. on Commerce, 74th Cong., 2d Sess. at 79–80 (Statement of R. E. Freer, Member, FTC) (1936); Hearings on S. 3744 Before the House Comm. on Interstate & Foreign Commerce, 74th Cong. 2d Sess. at 89–90 (Memorandum of Charles H. March, Acting Chairman, FTC) (1936).

49. Remarks of Rep. Lea, 83 Cong.Rec. 392, 406 (1938):

> . . . . A large class of businessmen who have never been subject to criminal procedure will have the opportunity to go to the Federal Trade Commission and conform to the requirements of the law without being brought into court or branded as criminals.
>
> . . . . The great majority of people who advertise want to do the right thing, and if the Government points out to them where they are making a mistake and are in violation of the law, they are willing to conform to the law. The man with good intentions should not be penalized before he has had a chance to correct his mistake.
>
> * * * * * * *
>
> . . . . [Strict liability for false advertising] is not a practical way to deal with businessmen. [It would] destroy the principal virtue of the Federal Trade Commission procedure, which is to give the honest businessman a chance to adjust his differences without harassing him or bringing him into court, with the expense involved by such proceedings.

Remarks of Rep. Halleck, 83 Cong.Rec. 401 (1938):

> I believe there is another reason why the Federal Trade Commission is the proper authority to have this power. These provisions . . . are generally the subject of quasi judicial action and determination, with decisions to be made affecting the rights not only of consumers but of producers and distributors. The Federal Trade Commission is a quasi judicial organization. It is independent and goes on year after year pursuing its activities.
>
> . . . . Something has been suggested here [in debate] about the broad language of this act. It is not definite. There is no catalog of the offenses sought to be reached. It was pointed out to the committee that only by the use of broad language would the Commission . . . have any real opportunity to accomplish any real results. . . . The very fact that broad language is used should indicate to all of us . . . that we should not in every case inflict a criminal penalty or a civil penalty . . . upon any person who happens unintentionally to violate the act.

Cf. S.Rep.No.361, part. 2, 74th Cong., 1st Sess. 9 (1935) (Minority Views).

The 1938 action by Congress in amending the Federal Trade Commission Act was in a context where that Act had been interpreted by the Supreme Court in Moore v. New York Cotton Exchange to hold that actions under § 5 must be brought by the FTC and not by private parties. A thorough ventilation of consumer interests and needs accompanied the 1938 amendments. Congress turned its attention to section 5 in two important respects, to overrule the *Raladam* precedent, and to incorporate the new food, drug and cosmetic provisions into the "unfair or deceptive acts or practices" prohibition; but Congress made no move to alter the *Moore* interpretation that precluded private enforcement of § 5.

The conclusion is inescapable that Congress intended enforcement of the Wheeler-Lea Amendments to rest wholly and exclusively with the Federal Trade Commission, following the pattern laid down in the 1914 Act.

### D. *Judicial Latitude for Implication of Private Remedies*

Appellants contend that the courts should look not to the form of the statute but to the social objectives sought to be furthered by it, and they argue that only through private rights of action can meaningful consumer protection against fraud and deceptive advertising be achieved. Similar contentions have been relied upon in other cases.[50] But in the case at bar this court's latitude for judicial constructs is limited. We are considering an Act in which ends and means, the social ends to be fostered and the administrative means of achieving those objectives, are inseparably interwoven into a unified and comprehensive statutory fabric. Both are the product of a legislative balance which took into account not only consumer protection but also interests of the businesses affected, with particular concern for tempered enforcement, the orderly development of commercial standards, and freedom from multiplicious litigation.

### 1. *Problems of compatibility of public and private enforcement*

We now consider various problems that might be presented to the public enforcement of the Act if private actions were given a full head of steam.

a. The Act gives the Commission a broad range of flexible enforcement powers available for use, as deemed necessary in the FTC's sound discretion and expert judgment.[51] Inherent in the exercise of this discretion is the interplay of numerous factors: the relative seriousness of the departure from accepted trade practices, its probable effect on the public welfare, the disruption to settled commercial relationships that enforcement proceedings would entail, whether action is to be taken against a single party or on an industry-wide basis, the form such action should take, the most appropriate remedy, the precedential value of the rule of law sought to be established, and a host of other considerations.[52] Above all, there is need to weigh each action against the Commission's broad range policy goals and to determine its place in the overall enforcement program of the FTC.

Private litigants are not subject to the same constraints. They may institute piecemeal lawsuits, reflecting disparate concerns and not a coordinated enforce-

50. See note 7, *supra*.

51. See FTC v. Colgate-Palmolive Co., 380 U.S. 374, 392–395, 85 S.Ct. 1035, 13 L. Ed.2d 904 (1965); Jacob Seigel Co. v. FTC, 327 U.S. 608, 66 S.Ct. 758, 90 L. Ed. 888 (1946); Consumers Prods., Inc. v. FTC, 400 F.2d 930 (3d Cir., 1968), cert. denied, 393 U.S. 1088, 89 S.Ct. 877, 21 L.Ed.2d 781 (1969); Erickson v. FTC, 272 F.2d 318, 322 (7th Cir., 1959), cert. denied, 363 U.S. 940, 80 S.Ct. 805, 4 L.Ed.2d 769 (1960).

52. *See* 1972 Annual Report of the Federal Trade Commission at 69–73; 1970 Annual Report at 7. *Cf.* Note, Developments in the Law: Deceptive Advertising, 80 Harv.L.Rev. 1005, 1068–71 (1967).

ment program. The consequence would burden not only the defendants selected but also the judicial system. It was to avoid such possibilities of lack of coherence that Congress focused on the FTC as an exclusive enforcement authority.[53]

■ b. The enforcement scheme embodied in the Federal Trade Commission Act, stresses the Commission's role in providing certainty and specificity to the board proscriptions of the Act. The FTC, as a quasi-judicial tribunal, has the ability to provide for the centralized and orderly development of precedent applying the regulatory statute to a diversity of fact situations. The FTC is also available to act in an advisory capacity to those who are anxious to comply with the terms of the Act.[54] This benefits not only advertisers, through certainty as to the applicable standard of conduct, but also consumers, by serving as a firm legal springboard for future FTC enforcement actions. These advantages would be endangered if thus central administrative tribunal were replaced by the various Federal courts invoked by private parties, even assuming that procedural devices for the control of class actions and the consolidation of multi-district litigation, plus the broad

application of principles of collateral estoppel, might alleviate the extremes of inconsistency and multiplicity.

■ c. In its 1938 selection of the FTC as the appropriate body to prevent deceptive advertising, Congress contemplated use of that agency's proven capability of resolving trade practice controversies without the need to resort to litigation, and its procedural machinery to encourage voluntary compliance.[55] The courts, on the other hand, have at their disposal only relatively rudimentary devices to promote settlements.[56] More important, they lack the expertise and knowledge of business practices needed to evaluate whether any settlement by the parties is in furtherance of the broad public interest that is the foundation of the Act.

d. While the FTC's special expertise may not be raised as a barrier inhibiting the kind of judicial review of agency action that Congress prescribed and contemplated,[57] it does and should inhibit the notion that a court may be injected into the pertinent subject-matter directly, without the benefit of FTC consideration. The Commission has developed a fund of knowledge as to the probable impact upon purchasers of particu-

53. See Remarks of Rep. Lea, 83 Cong. Rec. 392 (1938):

The question of penalties is involved. An amendment is about to be proposed here under a claim of making the penalties more severe. . . . Every violation would be made subject to a civil action to secure $3,000 in the courts instead of leaving the businessman as he is now left under the Federal Trade Commission procedure, to go to the Commission, where, if he can convince them of his honesty and purpose to conform to the law, the matter is closed so far as the future is concerned, unless he continues to commit his offense.

The effect of making every case a court case would be to clog the courts. The thousands of cases which are now disposed of without burdening the courts would clog the courts, create needless litigation and expense, or else the law would become a joke.

An amendment to this effect was defeated by a 52–36 vote. Id. at 409.

54. 16 C.F.R. §§ 1.1–1.6 (1972) (Advisory opinions and industry guides.) See 1971 Annual Report of the Federal Trade Commission 45; 1970 Annual Report 31–32; 1969 Annual Report 4, 29–36.

55. See 1969 Annual Report of the Federal Trade Commission 1, 3–6, 14, 29–30, 33–34. Cf. Address by Basil J. Menzies, Executive Director, FTC, before the Federal Bar Ass'n, Washington, D.C., June 12, 1972, 5 CCH Trade Reg.Rep. ¶ 50,-138.

56. See generally Dole, The Settlement of Class Actions for Damages, 71 Colum.L. Rev. 971 (1971).

57. See Volkswagenwerk v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 392–395, 444 F.2d 841, 850–853, cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

lar advertising representations,[58] and in recent years has been active in the evolution of new and innovative remedies to correct false advertising and to undo the effects of deceptive trade practices.[59] These reflect the FTC's familiarity with advertising and merchandising techniques, and their effective use is furthered by the FTC's continuing involvement in both evolving and policing remedies.

c. Perhaps some of these disadvantages could be remedied in part by FTC intervention in private proceedings, or through judicial use of the "supple" doctrine of primary jurisdiction.[60] But this could not retain the FTC's ability to control matters to be litigated in accordance with its priorities, to select its enforcement goals, and to husband its administrative and manpower resources.[61] The effect of requiring the Commission to intervene whenever it felt that a private litigant might stray from its policies, impair its precedents, or disadvantageously compromise meritorious litiga-

tion makes it part hostage to private concerns, part competitor (in a race to the courthouse), and risks not only its resources but the extent of its contribution to the public interest.

2. *The asserted need for a damages remedy*

We turn to appellants' contention that, because the FTC has no power to award damages to those victimized by false advertising, the courts must make compensatory damages recoverable in private actions. In general, or at least in many instances, the purpose and objective of Federal statutory prohibitions are likely to be furthered by judicial implication of compensatory remedies.[62] But this generality is overridden as to the problem before us by the plain choice of Congress. This Act does not purport to affect a consumer's right to obtain damages in a common law action sounding in fraud or deceit, or in any expansion of that action that may evolve in common law jurisprudence. As for an ac-

58. *See* FTC v. Colgate-Palmolive Co., *supra*, 380 U.S. at 384–392, 85 S.Ct. 1035, 13 L.Ed.2d 904; Niresk Indus., Inc. v. FTC, 278 F.2d 337, 341–342 (7th Cir.), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L.Ed.2d 104 (1960); Carter Prods., Inc. v. FTC, 268 F.2d 461, 495 (9th Cir.) cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120, rehearing denied, 361 U.S. 921, 80 S.Ct. 254, 4 L.Ed.2d 189 (1959).

59. *See, e. g.,* ITT Continental Baking Co., 3 Trade Reg.Rep. ¶ 19,681 (transfer binder) (FTC, 1971); 1972 Annual Report of the Federal Trade Commission at 9–10; Comment, Television Counter-advertising: "And Now a Word Against Our Sponsor," 3 Rut-Cam L.J. 516 (1972); Comment, Corrective Advertising: The FTC's New Formula for Effective Relief, 50 Tex.L.Rev. 312 (1972); Note, Corrective Advertising and the FTC: No, Virginia, Wonder Bread Doesn't Help Build Strong Bodies Twelve Ways, 70 Mich.L.Rev. 374 (1971). We intimate no view concerning the scope of the Commission's authority to compel an advertiser to disclose that prior representations were misleading. As a general matter, however, we would note that the FTC's broad discretion to frame remedies appropriate to the nature of the

statutory violation has long been judicially recognized. See note 51 *supra*.

60. *See* Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 68–69, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); United States v. Western Pac. R.R. Co., 352 U.S. 59, 62–65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Mobil Oil Corp. v. FPC, 149 U.S.App.D.C. 310, 319–320, 463 F.2d 256, 265–266 (1971), cert. denied, 406 U.S. 976, 92 S.Ct. 2413, 32 L.Ed.2d 676 (1972).

61. *See* 1972 Annual Report of the Federal Trade Commission, at 1, 2; 1971 Annual Report at 63–65.

62. *E. g.,* Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, *supra*; Fitzgerald v. Pan American Airways, Inc., *supra*; Reitmeister v. Reitmeister, *supra*. *See* Texas & Pac. Ry. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916). *But see* Moore v. Chesapeake & Ohio Ry., 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934); Jacobson v. New York, New Haven & Hartford RR, 206 F.2d 153 (1st Cir., 1953), aff'd per curiam, 347 U.S. 909, 74 S.Ct. 474, 98 L.Ed. 1067 (1954) (While Safety Appliances Act determines standard of care, action must be brought under state tort law.)

tion based on the Trade Commission Act, we are controlled by the Congressional purpose that this should not serve as a vehicle for redressing essentially private grievances.[63] Realistically, any action to recover the excess price ascribable to unfounded claims is likely to involve small sums per consumer, and to be significant more as a deterrent than as a compensatory mechanism. But in 1938 Congress considered matters of deterrence and rejected several proposals for potent alternatives, e. g., liability of advertisers on a per se basis for civil penalties in all cases of misleading representations.[64] The 1938 amendments relied instead on the FTC's cease and desist procedures, and their provision of opportunity for voluntary compliance and informal administrative conflict resolution.[65] We are controlled by the balance struck by Congress.

### 3. The claimed ineffectiveness of the Commission

Appellants urge that, because of insufficient staff and competing demands in other spheres of its jurisdiction, the Commission is simply unable to provide effective enforcement in the field of false advertising. In this connection, they point to the fact that the Commission began an investigation of non-prescription pain relievers in the 1950's; that in 1961 complaints were filed

against the appellee herein and other manufacturers, which were later withdrawn by the agency; that in 1967 rulemaking proceedings were instituted, only to be terminated in 1971 without the issuance of findings; and that there was no Commission action between January, 1971 and the argument of this appeal in September, 1972.

In the particular case, as it happens, the Commission moved on February 23, 1973, with issuance of complaints against Bristol-Myers and two other makers of non-prescription analgesics and their respective advertising agencies.[66] But taking the matter broadly in terms of general need for private actions, and putting aside any consideration of the reasons that may have impelled the FTC to proceed with extreme caution in preparing enforcement proceeding against three of the nation's largest advertisers, the thrust of appellants' charge is misdirected. It is tantamount to a broad scale attack upon the Commission's effectiveness as an agency. Yet it is raised in a suit to which the Commission is not a party.

Charges like appellants' are no novelty. Similar comments were made during the Congressional debates on the very legislation that gave the Commission jurisdiction over food, drug and cosmetic advertising.[67] Like complaints

---

63. S.Rep.No.221, 75th Cong., 1st Sess. at 2 (1937):

> It was never the intention of Congress that the Commission should be a forum where private disputes or controversies between competitors should be settled  . . . .

64. See note 53, *supra*, and accompanying text.

65. See note 49, *supra*, and accompanying text.

66. In re: Bristol-Myers Co., docket no. 8917; In re: American Home Prods. Corp., docket no. 8918; In re: Sterling Drug, Inc., docket no. 8919, summarized at 3 Trade Reg.Rep. ¶ 20,262 (transfer binder).

The complaint against Bristol-Myers covered advertising not only for *Excedrin*, the subject of this lawsuit, but also for two other analgesic compounds manufac-

tured and sold by the company. The scope of the FTC complaint is also considerably broader than that of the appellants, in terms of the specific advertising representations alleged to be deceptive. As to remedy, the Commission's proposed order both calls upon all the respondents to cease and desist from a broad range of allegedly deceptive practices and, in addition, requires Bristol-Myers to cease advertising altogether for a period of two years unless it agrees to devote not less than 25% of its advertising budget to corrective advertisements, which have been approved by the FTC and which are designed to counteract the allegedly misleading representations contained in the company's prior advertisements.

67. *E. g.*, Remarks of Senator Copeland in floor debate, 83 Cong.Rec. 3288 (1938):

> I am opposed to the House amendments to S. 1077 [giving the FTC juris-

have been voiced on subsequent occasions.[68] Yet Congress, has not seen fit to alter the statutory plan established in 1938.[69]

#### 4. *The doctrine of* Case v. Borak

We have given full consideration to Case v. Borak, holding that private actions would lie to redress violations of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), governing proxy disclosures.

Case v. Borak relied upon the general jurisdictional provision contained in § 27 of the SEC Act, 15 U.S.C. § 78aa.[70] The presence of this provision reduced the degree of "judicial implication" brought to bear in developing a private remedy, since it provided a firm basis from which to begin the process of extrapolation.[71] In contrast, the jurisdictional provisions of the Federal Trade Commission Act are specific, and expressly relate only to enforcement proceedings brought by the Commission or the Attorney General, or the review thereof.[72]

In *Case*, the Supreme Court referred to the difficulties faced by the SEC in examining the thousands of proxy statements filed annually and to that agency's limited resources.[73] Significantly, the SEC intervened in Case v. Borak as *amicus curiae*, bringing to the Court's attention its limited resources and urging the recognition of private remedies as an adjunct to its own enforcement powers.[74] In the matter before us, the FTC has not sought intervention, and we have reason to believe, as already noted, that the private remedy might well lie athwart rather than alongside the Commission's enforcement programs.

The SEC is primarily a clearance agency, and once its clearance responsibilities have been carried out and the proxy statement, registration statement, or the like has been permitted to become effective, there is little danger that an intervening private suit will derail the Commission's ongoing administrative processes. In the case of the Trade Commission, the corporation's dissemination of materials represents not the end of a (clearance) proceeding but the beginning of administrative scrutiny and a potential enforcement problem. It is this that underlies the problem, already

diction over food, drug, and cosmetic advertising] for the two reasons I have indicated. First, the amendments make no substantial advance in authority over what has been contained in the Federal Trade Commission Act for more than 20 years. Second, inclusion of authority to control false advertising [for foods, drugs, and cosmetics] in the Federal Trade Commission will result in waste, inefficiency, and failure of consumer protection.
*See* H.R.Rep.No.1613, 75th Cong., 1st Sess. at 23 et seq. (1937) ; 38 Cong.Rec. 394, 399–400, 403, 406, 408–410, 415, 3288–89 (1938).

68. *E. g.*, 5 Commission on Organization of the Executive Branch (Hoover Commission), Task Force on Regulatory Commissions 119–33 (Appendix N) (1949) ; E. Cox, R. Fellmeth, J. Schultz, The "Nader Report" on the Federal Trade Commission (1969) ; Report of the ABA Commission to Study the Federal Trade Commission (1969).

69. Proposals have been made to create private rights of action under the Act, *e. g.*, S.1823, H.R.1078, 5368, 92d Cong., 1st Sess. (1971). The 92nd Congress expired without any of these bills having reached the floor of either house.

70. The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter . . . and of all suits in equity or actions at law brought to enforce any liability or duty created by this chapter . . . .

71. Case v. Borak, *supra*, 377 U.S. at 430–431, 84 S.Ct. 1555, 12 L.Ed.2d 423. *See* Deckert v. Independence Shares Corp., *supra*.

72. *See* 15 U.S.C. §§ 45(b)–(d), (*l*), 53, 56.

73. 377 U.S. at 432–433, 84 S.Ct. 1555.

74. Brief of Securities & Exchange Commission as *amicus curiae*, Case v. Borak, *supra*. *Cf.* Allen v. State Board of Elections, 393 U.S. 544, n. 23 at 557, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

discussed, that private actions may disrupt or incommode the FTC's own investigative or prosecutorial activities, say, by being brought at the wrong time, or against the wrong party, or in the wrong sequence, or without regard to settlement choices, etc.

### 5. The judicial role under the Act

■ The role of the courts in the enforcement of the Federal Trade Commission Act is one that comes into play primarily only after the Commission has set its administrative processes in motion. The court's role is not one of direct enforcement but one related to the administrative process—in part supervisory and in part collaborative.[75]

A fair reading of the statute and its legislative history evinces a plain intent by Congress to make the administrative program for enforcing the Federal Trade Commission Act an exclusive one. When a court fairly perceives how the legislature accomplished a resolution of the balance of forces, including compromise and concession, the court must abide the result without using its own scales to weigh the strength of the component vectors. To imply a private right of action to enforce the Federal Trade Commission Act—however desirable or logical this might appear in the abstract—would be contrary to the legislative design which we discern to have been deliberately wrought.

### E. The Common Law Claims

As to appellants' common law and equity claims, we are in complete accord with the ruling of Judge Jones.

■ Appellants' common law claims for money damages must be dismissed for want of the $10,000 amount in controversy necessary to establish jurisdiction under 28 U.S.C. § 1332. The individuals comprising the class of appellants each suffered damages of minuscule proportions, "perhaps less than $5.-00" (Appellants' Br. at 20). These claims cannot be aggregated merely because they are raised in a class action. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). If appellants wish to pursue any common law claims, they must have recourse to the Article I courts established by Congress for the District of Columbia.[76]

Concerning the claim based on general "equity" jurisprudence, there is no precedent for treating allegedly deceptive advertising as a "public nuisance," amenable to injunctive relief. Such a radical doctrine could brook much mischief, including a multitude of inconsistent state prohibitions and requirements. We have no warrant for conjecturing that the District of Columbia Court of Appeals would 'embark on such a course.

We need not dwell long on the possibility of an appeal to a federal equity jurisprudence. In 1938 Congress specifically rejected a proposal for the use of court injunctions against a "nuisance" of false drug advertising in interstate commerce,[77] and instead relied on the FTC for enforcement.

Affirmed.

---

75. See Greater Boston Television Corp. v. FCC, supra, 143 U.S.App.D.C. at 393–394, 444 F.2d at 851–852.

76. The District of Columbia's rules of procedure permit the maintenance of class actions on precisely the same terms as the Federal Rules of Civil Procedure. See Rule 23, Civil Rules, D.C. Superior Court (1971).

77. See note 25, supra, and accompanying text.