**BUSINESS EQUIPMENT CENTER, LIMITED, Plaintiff,**

v.

**DeJUR–AMSCO CORPORATION, Defendant and Counterclaimant,**

v.

**Sidney W. ROSEN et al., Counterclaim Defendants.**

**Civ. A. No. 76–1680.**

United States District Court, District of Columbia.

Feb. 21, 1978.

Edward L. Genn, Washington, D. C., for plaintiff and third-party defendant Rosen.

Jerome S. Wagshal, Washington, D. C., for defendant.

John Shorter, Jr., Washington, D. C., for third-party defendant BEC, Baltimore.

## MEMORANDUM

GASCH, District Judge.

After numerous peripheral skirmishes that have taken their toll, both on the parties and the Court, defendant now attempts with this motion for summary judgment to take the offensive in an effort to inflict a fatal blow on plaintiff's case. Rather than counterattack, plaintiff has dug in, hoping

that the blows will miss their mark, that the assault will fail, and that conditions for victory will be more advantageous at a later date. The facts and events leading to this battle as well as the blow-by-blow description of it are recited below.

## BACKGROUND

Defendant DeJur-Amsco Corp. (DeJur) was an importer of dictation equipment,[1] and plaintiff Business Equipment Center, Ltd. (BEC), up to the time of this lawsuit, was the sole independent distributor of DeJur's equipment in the District of Columbia metropolitan area. This relationship was confirmed by contract until around 1974. BEC acknowledges, however, that no formal contract has existed since then.[2] In 1971 BEC also became the franchised dealer of Sony, whose dictating equipment is competitive with that of DeJur's. BEC alleges that its status as a DeJur dealer was to continue so long as it adequately and reasonably served DeJur's interests in the D.C. area. For purposes of this motion, DeJur does not dispute that.

■■■ Based on the affidavit of Mr. Steven Monk, DeJur's Vice President for Administration, and also on data from DeJur's business records attached as exhibits to that affidavit, it appears the BEC's purchases of DeJur machines, parts, and accessories declined steadily from $206,800 in 1969 to $8,275 during the first ten months of 1976. Considering new machine purchases only, the figures are $185,000 in 1969 and nothing in 1976. BEC's performance as a DeJur dealer not only declined in this absolute sense, but other information from the Monk affidavit also reveals a decline in DeJur's performance relative to the performance of all other DeJur dealers.[3] BEC was fourth

1. Subsequent to the filing of the complaint, DeJur liquidated, and its assets were purchased by NTI Business Equipment Corp. BEC repeatedly has urged that inferences adverse to DeJur be drawn from this fact. It alleges that DeJur's principal shareholder and President, Mr. W. Bruce Hansen, overloaded dealers' inventories and set up new dealers in order to give the appearance of an active, viable entity while intending all along to liquidate the corporation when its cash reserves were at their highest. BEC has presented nothing more than this naked allegation. Accordingly, in the context of this summary judgment motion, the Court will not draw the inferences BEC urges. The Court is to decide this motion on the basis of undisputed facts, not on the weight of the bald allegations.

2. Complaint ¶ 2, at 3; Plaintiff's Supplement To Opposition For Summary Judgment Consisting Of Affidavit Of Sidney Rosen In Support Of Opposition And Further Constituting Statement Of Issues With Regard To Which There Is A Genuine Issue Of Material Fact And A Statement Of Such Facts at 8 [hereinafter cited as Rosen Affidavit].

3. BEC has moved to strike this portion of the Monk affidavit. It argues that because Monk did not join DeJur until 1976, he could have no personal knowledge as to what transpired before that time. As Vice-President for Administration with DeJur, however, he would know of the relative standings among the dealers based on his familiarity with the content of DeJur's business records derived from the performance of his normal duties. BEC also argues that the exhibits attached to the Monk affidavit, which summarize the detailed sales data of the top twenty to thirty DeJur dealers, should be stricken because they are not certified copies of records kept in the ordinary course of business and therefore, as hearsay, would not be admissible in evidence. But see Fed.R.Evid. 1006 (contents of voluminous writings that cannot be conveniently examined in court may be submitted in summary form so long as duplicates are made available to opposing party at a reasonable time and place).

Although motions to strike are appropriate when the affidavit is not based on personal knowledge or contains inadmissible evidence, the Court has discretion to determine whether the motion is timely. See 6 pt. 2 Moore's Federal Practice ¶ 56.22[1], at 56–1332 (2d ed. 1976). BEC did not file its motion to strike until the day before the hearing on summary judgment, even though it had been served with a copy of Monk's affidavit some eight weeks earlier. At no time during that period did BEC attempt to depose Monk. Moreover, it apparently has made no effort to inspect DeJur's business records, although they have been available since September 21, 1977, when the Court issued an order resolving the discovery dispute that until then had kept those documents from BEC's reach. Although BEC's counsel contends that those records have still been kept from him, at no time since then has he moved to compel their discovery. Another noteworthy point is that much of this data is of such a nature that BEC's own business records seemingly would contain information to refute any inaccuracies, if in fact there are any.

Had a timely motion to strike been filed, DeJur would have been able to correct any

in sales in 1971, sixth in 1972 and 1973, twelfth in 1974, thirteenth in 1975, and at the bottom in 1976.[4]

Early in BEC's and DeJur's relationship, it was agreed that because of BEC's strategic position as the DeJur dealer in the District of Columbia area, it would get commissions on all sales to the federal government wherever made and whether or not made by BEC. In 1974 about 70 percent of these commissions were from BEC's own sales to the Government, but in 1975 virtually all the commissions came from sales by other dealers.[5]

DeJur contends that the reason for this decline in BEC's performance was the latter's decision to focus its efforts on sales of Sony equipment and further that as a result of this decision, BEC intentionally switched its DeJur customers to the Sony line. DeJur's evidence for this contention comes from various sources.

First, DeJur relies on the deposition of Mr. William Broderick, National Sales Manager of the Business Products Division of Sony from February, 1972, to February, 1975. He testified at his deposition that BEC was the top Sony dealer in the United States by almost $75,000 in sales during the year November, 1973, to October, 1974. He further stated that BEC consistently was one of the top three Sony dealers during his term as Sony National Sales Manager and that probably they were number one each of those years.[6] DeJur argues that the obvious inference to be drawn from BEC's rise to the top as a Sony dealer coincidental with its fall to the bottom as a DeJur dealer is that BEC's customers were intentionally switched from DeJur to Sony equipment.

Two additional evidentiary items have been offered by DeJur to support that inference. The first is the testimony of Ms. Susan Ramsey, office manager of a District of Columbia law firm, that in September, 1976, BEC attempted to switch her firm from its DeJur equipment even though they were satisfied with it.[7] The second is a copy of a letter written in 1972 by Mr. Sidney Rosen, President and principal stockholder of BEC, and sent to the Univer-

deficiencies that may exist in the affidavit and exhibits. Because of its failure to do so and its failure to engage in other discovery that might have led to facts refuting this data, and because this information is not as potentially unreliable as are many other hearsay categories, the Court will not strike this information. See Case & Co., Inc. v. Board of Trade, 523 F.2d 355, 361 (7th Cir. 1975) (in granting summary judgment for defendant, court did not err in considering a list in nature of a summary when plaintiff's counsel had sufficient opportunity for discovery and could have inspected records summarized in the affidavit to challenge any alleged inaccuracies).

4. It is not clear how many DeJur dealers there are, but the data show that at least twenty-seven were ahead of BEC at the time of termination.

5. In BEC's effort to demonstrate the presence of disputed facts herein, it argues that DeJur calls these benefits from the governmental sales by other dealers "commissions" at one point and "credits" at another and submits that an adverse inference should be drawn from this inconsistency. What these benefits are called, however, is not important; the relevant information is BEC's declining performance in the generation of these sales to the Government.

6. BEC also moved at the last minute to strike portions of the Broderick deposition. The principal basis for this motion is lack of personal knowledge by Broderick as to the facts he asserts. While the Court agrees that certain portions of the deposition do reflect a lack of personal knowledge, the facts just recited in the text above are not in that category. Clearly, as National Sales Manager, Broderick would have firsthand knowledge as to who Sony's top dealers were.

7. BEC's reply to the Ramsey statement is two-fold. First, it says the statement is untrue because her complaint to DeJur "was instigated by a co-conspirator, Washington Office Products, under questionable circumstances." Rosen Affidavit at 32. BEC offers no facts to support this allegation, however. BEC's second rebuttal point is that this complaint came after it had been terminated as a DeJur dealer and thus is irrelevant to its performance before that termination. Precisely when the termination occurred is of some disagreement. Although the exact date may be material for purposes of the weight to be given this one evidentiary matter, it is not material for the overall disposition of this motion. See note 11 infra.

sity of Maryland.[8] In that letter, Mr. Rosen referred to the universal cassette, an item of dictating equipment sold by Sony but not by DeJur, and then he wrote:

> From my end, I took my gamble in putting all my chips in that direction by investing in the future of Sony's equipment.

Letter from Sidney W. Rosen to Mr. Friedman of the University of Maryland at Baltimore (Mar. 1, 1972).

In March and in April of 1976 two DeJur representatives met with Mr. Rosen and told him that DeJur no longer wished to do business with BEC. BEC alleges that thereafter DeJur refused to deal with it, but DeJur's evidence shows sales to BEC of over $8,000 in parts and accessories though no sales of new machines were made.[9] Mr. Rosen acknowledged these sales in his deposition.[10]

Prior to these meetings with Rosen in the spring of 1976, DeJur hired Mr. Roy Witte and Mr. Phillip Vertin to work on improving its sales picture. At some point during this time frame, precisely when being unclear, DeJur also established at least two other dealers in the District of Columbia area, Rockville Office Machines and Washington Office Products. BEC believes a conspiracy exists among DeJur, these two new employees, and the two new dealers to undermine BEC's government sales and its business generally and then to take it over. Accordingly, BEC filed this suit in September, 1976. In November, 1976, DeJur by letter formally terminated BEC as a franchised or authorized dealer of DeJur products.[11]

BEC's complaint alleges that DeJur: breached their agreement by terminating BEC's dealership without cause or notice; conspired in violation of the antitrust laws; made fraudulent misrepresentations to BEC; and interfered with BEC's business relations and engaged in unfair competition. DeJur has counterclaimed, but it is not now before the Court as DeJur's motion only asks for summary judgment with respect to BEC's complaint.

## MERITS

This case is of course governed by the standard of Rule 56, which states that summary judgment shall be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The case law is replete with a litany of standards to be applied to summary judgment decisions,[12] but they

---

8. Prior to the hearing on this motion, the authenticity of this letter was the subject of a discovery dispute between the parties. At oral argument, however, BEC conceded the existence of this letter and the accuracy of DeJur's copy. Transcript at 28.

9. Affidavit of Steven J. Monk, ¶ 3, exhibit 1 (Nov. 22, 1977).

10. *See* Deposition of Sidney W. Rosen at 210 (June 13, 1977). As subsequent discussion will show, however, even if there had been absolute refusal to deal, that would not affect the outcome of this case. See pages 784–787 *infra*.

11. As mentioned in note 7 *supra*, the parties disagree as to whether the November, 1976 letter constituted the termination or whether the termination already had occurred in March or April, 1976 when DeJur representatives verbally told Rosen it no longer wished to do business with BEC. BEC argues for the earlier date and DeJur for the later. The Court notes, however, that BEC's counsel during the deposition of Mr. Witte stated:

> [W]e have already established that the termination, based on prior information, if there ever were an effective termination—which is not necessarily the case—but even assuming that the situation, that was not until November of 1975 . . . or in 1976 I mean, November of '76 . . . . .

Deposition of Mr. Roy D. Witte at 121–22 (Mar. 24, 1977). Apparently, BEC now believes that by arguing that the termination was earlier, DeJur's position is more vulnerable. The important issue in this case, however, is the reason for the termination, not its date. Furthermore, as noted earlier in the text, Mr. Rosen answered at his deposition that he was never refused any order of his until after this suit was filed by BEC, which was in September, 1976, a date much closer to DeJur's contention than to BEC's. Deposition of Sidney W. Rosen at 210 (June 13, 1977).

12. *E. g., Bloomgarden v. Coyer*, 156 U.S.App. D.C. 109, 114–15, 479 F.2d 201, 206–07 (1973).

provide little additional guidance beyond that in the rule itself because the facts of the particular case are more controlling than these judicial paraphrases of the rule. It is the litany of these general principles, however, upon which BEC's opposition to this motion generally rests. The nature of this opposition requires that it be addressed before considering the facts that are not disputed and their bearing on the legal issues governing the merits of this case.

BEC's opposition basically proceeds along two fronts. First, it argues that summary judgment is inappropriate in antitrust cases generally and specifically in this case because of the disputed facts it alleges it has raised. Secondly, it argues that summary judgment is inappropriate at this juncture because BEC has yet to complete its discovery in the case.

In support of this opposition, BEC has filed one of the most unusual documents this Court has ever seen in civil litigation. It is entitled Supplement To Opposition To Motion For Summary Judgment Consisting Of Affidavit Of Sidney Rosen In Support Of Opposition And Further Constituting Statement Of Issues With Regard To Which There Is A Genuine Issue Of Material Fact And A Statement Of Such Facts. The principal item, as the title suggests, is the affidavit of Mr. Rosen, BEC's President and principal owner.

The Rosen affidavit begins with the standard statement that it is "based on personal knowledge." Immediately thereafter, however, he qualifies that claim by stating that some of the content is based on information and belief. As to these facts stated on information and belief, he attempts to improve their reliability by asserting that they are "true according to such information available to him as of the present time."

After these qualifications, the affidavit continues for thirty-six pages, one paragraph of which runs unbroken for over six of those pages. These pages are filled with allegations, claims, assertions, denials, averments, charges of falsehoods and inaccurate data by DeJur, personal attacks upon DeJur's affiants and deponents, and references to the existence of evidence outside the affidavit and record of this case which Mr. Rosen claims will support BEC's case when it goes to trial. At one point Mr. Rosen's affidavit quotes fourteen pages of excerpted portions of the deposition of Mr. W. Bruce Hansen, DeJur's President. Mr. Rosen then asserts that inferences adverse to DeJur are "obvious" from these excerpts and denies Hansen's credibility as to the remaining portions of his deposition. A similar reference to an "obvious" adverse inference is made to an attached document of DeJur's showing its sales to DeJur dealers.[13] The last pages of the affidavit are almost like an answer to a complaint, quoting a paragraph from DeJur's statement of undisputed facts and then denying the statement or admitting it with qualifications. In sum, it becomes exceedingly difficult to find straightforward statements of hard facts that can be separated from the rest of the affidavit's content and that can then be compared to DeJur's statement of undisputed facts.[14]

After the conclusion of the affidavit, BEC cites nine cases for the proposition that summary judgment is inappropriate when the record is inadequate.[15] Of course, that is the law, and in those cases the records clearly revealed material issues of fact to be in dispute. The question is: In which category does the record of this case fall?

---

**13.** No explanation is made as to how these obvious inferences are reached. Mr. Rosen's vision must be better than the Court's, for it fails to see them.

**14.** This difficulty is compounded by BEC's failure to follow Rule 1–9(h) of this Court requiring references to the parts of the record relied upon to support its statement of genuine issues.

**15.** In fact, these are the only cases cited by BEC in its entire opposition. At no point does it attempt to counter directly DeJur's main thrust at the legal sufficiency of BEC's complaint in light of the facts DeJur alleges to be undisputed.

Principal reliance from those nine cases is placed upon the Supreme Court's statement in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), that:

> Summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles the proof is largely in the hands of the alleged conspirator.

*Id.* at 472–73, 82 S.Ct. at 491. That is not the Supreme Court's latest pronouncement on this issue, however. In *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Court affirmed a lower court's entry of summary judgment for a defendant in an antitrust case. It distinguished *Poller* by noting that in it there had been substantial evidence tending to show the existence of a conspiracy to eliminate a competitor, thereby creating a genuine factual issue material to that case. *Id.* at 285, 88 S.Ct. 1575. The Court then went on to say that Rule 56(e) makes it clear

> that a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him.

*Id.* at 289, 88 S.Ct. at 1592. The plaintiff therein had argued that the effect of this rule was to shift the burden of proof to him. To this the Court responded:

> To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared

to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*Id.* at 289–90, 88 S.Ct. at 1593. The Court of Appeals for this circuit has applied this principle in a recent antitrust case affirming award of summary judgment for the defendant. *Merit Motors, Inc. v. Chrysler Corp.*, 187 U.S.App.D.C. 11, 569 F.2d 666 (1977). This Court also recently has applied the principle. *National Tire Wholesale, Inc. v. Washington Post Co.*, 441 F.Supp. 81, 84 (D.D.C.1977), *aff'd mem,* (D.C.Civ. Apr. 6, 1979), 595 F.2d 888.

■ Thus, in antitrust actions, as in any others, an opponent to summary judgment must comply with Rule 56. He may not rest on the allegations of his pleading, but

> must set forth *specific facts* showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Fed.R.Civ.P. 56(e) (emphasis added). It does not appear to this Court that BEC has put in dispute the essential facts set forth by DeJur and discussed below on their legal sufficiency for DeJur's motion. BEC has not done so by referring to proposed evidence outside of the record;[16] it has not done so in standing by the allegations of its complaint;[17] and it has not done so with its denials unaccompanied by facts that would be admissible in evidence to show the genuine factual dispute.[18]

BEC's second argument for not granting DeJur's motion for summary judgment rests on its intent to conduct further discovery. Rule 56(f) provides that the Court may refuse the motion for summary judgment or order a continuance when there is a need for further discovery.

---

16. *King v. National Indus., Inc.*, 512 F.2d 29, 33–34 (6th Cir. 1975); *United States v. Article Consisting of 36 Boxes, More or Less, Labeled "Line Away, Temporary Wrinkle Smoother, Coty"*, 284 F.Supp. 107, 113 (D.Del.1968), *aff'd,* 415 F.2d 369 (1969).

17. *Shehi v. Southwestern Bell Tel. Co.*, 382 F.2d 627, 628 (10th Cir. 1967).

18. *Minnesota Mining & Manufacturing Co. v. United States Rubber Co.*, 279 F.2d 409, 415–16 (4th Cir. 1960).

Merely asserting the need, however, is insufficient. A further need for discovery was also raised by the losing plaintiff in *First National Bank, supra.* Plaintiff therein contended "vigorously that the discovery he ha[d] obtained ha[d] been too limited to enable him adequately to resist the motion for summary judgment." 391 U.S. at 294, 88 S.Ct. at 1595. The Court dismissed that argument, however, finding that it had had "sufficient discovery to substantiate his claims of conspiracy to the extent of raising a material issue of fact thereon . . . ." *Id.* at 298, 88 S.Ct. at 1597.

In this circuit, too, the court has rejected a claimed need for additional discovery as a basis for denying summary judgment when the opponent already had had an ample opportunity. In *Merit Motors, Inc. v. Chrysler Corp., supra,* the court noted the long period the party had had for discovery and then stated that it was unwilling "to send this case to trial on the mere promise that a more substantial showing will be made there." 187 U.S.App.D.C. at 18, 569 F.2d at 673. Although not an antitrust case, perhaps the most pertinent statement on this issue from this circuit came in *Chung Wing Ping v. Kennedy,* 294 F.2d 735 (D.C.Cir.), *cert. denied,* 368 U.S. 938, 82 S.Ct. 380, 7 L.Ed.2d 337 (1961), when the court stated:

> At the hearing on the motion for summary judgment and on appellants' motion for a continuance, appellants stated that they were unable even to argue effectively the motion for summary judgment without the information they sought to obtain by discovery. It is beyond dispute that a motion for continuance is addressed to the sound discretion of the court. We note that appellants did nothing to obtain discovery until some ten months after filing their complaint, when the merits of their case was called into

question by the summary judgment procedure. Diligent prosecution of a cause of action which is dependent for success upon discovery demands that the plaintiff seek discovery in preparation of his case and not as a back-door defense to a test of the merits of his claim.

*Id.* at 737.

BEC likewise has had an ample opportunity to gather evidence to support its claims and raise a genuine, material dispute of fact. First of all, it has mentioned the availability of evidence outside the record, and some of its denials of DeJur's facts, if valid, would be supportable by data from its own records. The purpose of invoking the summary judgment procedure is to "smoke out" those facts.[19] Having failed to come forward with those facts so that they may be tested, BEC must assume the risk of whether DeJur's facts are sufficient to support its legal argument.

Secondly, BEC has not pursued production of documents from DeJur. After its initial request was served on DeJur, DeJur moved for a protective order on the ground that some of the documents contained competitive information. On September 21, 1977, this Court broke that deadlock by ordering BEC to use the information gained from DeJur's records only for litigation purposes. Since that date, BEC apparently has made no effort to inspect those documents although they have been available for over four months.[20] BEC served another document request on DeJur shortly after this first one. That, too, became a subject of dispute between the parties, and on September 20, 1977, this Court granted DeJur a protective order against this second set on the ground that it was not served for a bona fide discovery purpose. BEC expressly was given leave, however, to submit a proper request for discovery on DeJur.[21] It

**19.** *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir. 1972).

**20.** Affidavit of Jerome S. Wagshal ¶ 9 (Jan. 24, 1978).

**21.** The document request that BEC had served on DeJur was virtually a mirror image of a request previously submitted by DeJur to BEC, to include merely xeroxing some of the pages of DeJur's request and only changing their

took no action on this, however, until January 13, 1978. Again, that was nearly four months later, over five weeks after the summary judgment motion had been filed, and approximately one week after the hearing had been scheduled.

Thirdly, BEC has taken the depositions of three DeJur officials and although it now argues that it needs to take several other depositions, it has failed over the past several months to do anything in that regard. Not having participated in the DeJur deposition of Mr. Broderick, BEC argued at the December 19, 1977, status hearing on this case that it needed to examine him before any hearing on the summary judgment motion. It failed, however, to take advantage of three alternative dates when Mr. Broderick would have been available for deposition.[22] Moreover, since mid-1977 no notice of deposition of any other potential witness has been served on DeJur.[23]

This performance brings BEC appropriately within the references made by the Court of Appeals in *Chung Wing Ping* and *Merit Motors* : That is, BEC cannot claim a need for discovery as a back-door defense to DeJur's summary judgment motion, nor can it defeat that motion simply with a promise that it will make a more substantial showing when the trial is held. It has had an adequate opportunity to develop its case.

Having concluded that the grounds for BEC's argument that summary judgment is inappropriate in this case are themselves inappropriate, that does not necessarily

mean that DeJur is entitled to entry of judgment in its behalf. The undisputed facts must first be considered in light of the legal principles governing the merits of the case.

Plaintiff's principal cause of action appears to be based upon alleged violations of the federal antitrust laws. The first of these is section one of the Sherman Act, which provides:

Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (Supp. V 1975).

■ The Supreme Court in *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), addressed the purpose of the Sherman Act and the relationship of that purpose to a retailer's interaction with its dealers. Therein the Court stated:

The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.

page numbers. The letter of transmittal accompanying the request essentially said that this duplication was not a waiver of any objections BEC might have to the requests as they were made by DeJur. The letter continued to say that this filing not only provided for such documents as may be appropriate within the request, but also established reciprocity of request, and finally tested the good faith of DeJur to be willing to produce at least a large part of what it requested of BEC. The Court concluded from this that the request was not served for bona fide discovery purposes and therefore ordered that DeJur need not answer. The order further stated that if BEC resubmitted "a proper request for discovery upon the defendant, the latter will be required to respond to such request, subject of course to its right to seek a protective order for some other just reason." Order of September 20, 1977.

22. DeJur assisted in making these arrangements, and it notified BEC of them, even though Mr. Broderick is not and was not a DeJur employee. Mr. Broderick indicated, however, that he would not appear unless subpoenaed, as he had been for DeJur's deposition. Nevertheless, BEC made no effort to subpoena him.

23. Affidavit of Jerome S. Wagshal ¶ 9 (Jan. 25, 1978). There was some indirect indication that in September, 1977, BEC would depose Mr. T. Michael Fitzmaurice, President of Washington Office Products, one of DeJur's new District of Columbia dealers. For some reason, the tentative arrangements made were never formalized by a notice of deposition. Affidavit of Nelson Deckelbaum (Jan. 20, 1978).

*Id.* at 307, 39 S.Ct. at 468. More recently in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Court again discussed section one of the Sherman Act and in doing so, described the extremes of restrictive business practices. After noting examples that constituted per se violations, the Court continued:

> At the other extreme, a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods. If the restraint stops at that point—if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act.

*Id.* at 376, 87 S.Ct. at 1864 (citing *United States v. Colgate & Co., supra*) (dictum). Thus, unilateral action by DeJur in terminating BEC as its District of Columbia dealer and in selecting new dealers was not a violation of section one.[24] There must have existed some kind of combination or conspiracy whose actions caused the termination, but BEC has submitted no facts to suggest one; it only alleges that concerted action occurred. Merely because DeJur established new dealers, however, does not alone permit the inference that they conspired against BEC. The very nature of the act required them to engage in negotiations.[25] Moreover, the presence here of a valid business reason for the termination reinforces the conclusion that there is no section one violation, even if the effect of the termination resulted in serious damage to BEC's business.[26]

BEC's declining sales performance certainly is a legitimate business reason for DeJur to have terminated its dealership with BEC. BEC has submitted no facts to contradict this sales data. Rather, it declares that the accuracy of the data cannot be conceded, and alleges that the reasons for the declining performance were poor management by DeJur, DeJur's failure to remain competitive, and DeJur's coercion of dealers to build their inventories unnecessarily high in earlier years. The only support for this is Mr. Hansen's acknowledgement that DeJur had fallen from a major distributor of dictating equipment to a minor distributor, and his belief that part of the reason was the failure of its supplier to keep pace with new product introductions that were occurring and also increased efforts by DeJur's competitors. Although this is supportive of the allegations, it does not mean that poor sales performance by DeJur dealers was not also a contributing factor to the decline. Moreover, even assuming those allegations to be true, they would only be excuses for the absolute decline in BEC's sales and would not explain the contemporaneous decline in BEC's standing relative to all other DeJur dealers.

BEC further argues that this declining sales performance, even if its own fault, was just a pretext for termination. It contends that the actual reason was that DeJur did not want BEC also to sell Sony products and that when it continued to do so, it was terminated. Again, BEC has put into the record virtually no facts to support that argument except for Mr. Rosen's state-

---

24. *Accord, Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 76 (9th Cir. 1969) *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (well settled that no per se violation when supplier gives distributor exclusive franchise, even if another distributor is thereby cut off).

25. *Beckman v. Walter Kidde. & Co.,* 316 F.Supp. 1321, 1326 (E.D.N.Y.1970), *aff'd,* 451 F.2d 593 (2d Cir. 1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972); *see Thomas v. Amerada Hess Corp.,* 393 F.Supp. 58, 71–72 (M.D.Pa.1975).

26. *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1248–49 (5th Cir. 1975); *Wilson v. I.B.E. Indus., Inc.,* 510 F.2d 986, 989 (5th Cir. 1975); *Ricchetti v. Meister Brau, Inc.,* 431 F.2d 1211, 1214–15 (9th Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971).

ment that it is true.[27] But again, even assuming that this was an additional reason for DeJur's action, that does not make it illegal.[28]

■ Finally, the Sherman Act prohibits only unreasonable restraints of trade.[29] Having concluded, however, that the action taken here was unilateral and not the result of a conspiracy, it is not necessary to address this element.[30]

Another alleged antitrust violation raised by BEC involves section three of the Clayton Act, which provides:

It shall be unlawful for any person engaged in commerce . . . to lease or make a sale or contract for the sale of goods . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor . . . where the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14 (1970). BEC has not articulated its theory under this provision, but has only listed its statutory citation.

■ Much of the discussion above concerning section one of the Sherman Act is equally applicable to this Clayton Act provision. More specifically, this section is worded in terms of leases, sales, or contracts. Therefore, a termination of a dealership and a further refusal to deal by themselves are not prohibited. To be a violation, there must have been an agreement between the parties that prevented BEC from selling any Sony products,[31] and no such agreement has been shown.

27. The Court notes, however, that Mr. Rosen cites no facts to support his conclusion. He refers to no correspondence from DeJur in which the latter expressed or even suggested that this was the reason. Neither does he refer to the dates and contents of any conversations with DeJur officials addressing this issue. The only other fact arguably supportive of this allegation is from the Hansen deposition wherein Hansen stated that Mr. Albert M. Battis, formerly President of DeJur's Business Equipment Division, had told him that Mr. Rosen of BEC was probably the best representative for DeJur in the District of Columbia area. It is a strained inference, however, to conclude that this reflects adversely on DeJur in this case or that it creates a disputed material fact. BEC was the only DeJur representative in the area at that time so it is unclear what Mr. Battis meant. BEC has not attempted to take Mr. Battis' deposition or to obtain his affidavit in order to amplify the argument it wishes to make from that statement. Moreover, final responsibility as to who would be DeJur's dealers seemingly would rest with the corporation president, Mr. Hansen, and therefore it is not actionable for him to reject a characterization of a subordinate officer.

Mr. Rosen's general statement and this one unclear representation of Mr. Battis are merely thin saplings lost in the dense forest of the sales records.

28. *Carbon Steel Prods. Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584, 588 (S.D.N.Y.1968) (assuming defendant's refusal to fill plaintiff's orders was caused solely by plaintiff's sale of imported steel similar to defendant's, such refusal without proof of some form of combination as well as undue restraint of trade is not a violation of antitrust laws); *see Timken Roller Bearing Co. v. FTC*, 299 F.2d 839, 842 (6th Cir.), *cert. denied*, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962) (antitrust laws do not compel manufacturer to keep dealers with divided loyalties adverse to manufacturer's interests); *Garrett's, Inc. v. Farah Mfg. Co.*, 412 F.Supp. 656, 664 (D.S.C.1976) (manufacturer, absent monopoly power, may discontinue dealing with whomever it wishes, including customers that have sold its product below suggested retail price); *Tripoli Co. v. Wella Corp.*, 286 F.Supp. 264, 266 (E.D.Pa.1968), *aff'd*, 425 F.2d 932 (3d Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970) (defendant's refusal to deal with plaintiff because latter declined to maintain resale price to defendant's satisfaction not a violation of antitrust laws).

29. *Standard Oil Co. v. United States*, 221 U.S. 1, 59–60, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

30. The Court notes, however, that there are other dealers in this area in the same product, and that products of DeJur's competitors also are available in the market place. Thus, there would appear to be no undue restraint of trade as the result of BEC's termination as a DeJur dealer. *See Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683, 686 (6th Cir. 1976); *Dart Drug Corp. v. Parke, Davis & Co.*, 120 U.S.App.D.C. 79, 84, 344 F.2d 173, 178 (1965).

31. *E. g., Timken Roller Bearing Co. v. FTC*, 299 F.2d 839, 842 (6th Cir.), *cert. denied*, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962); *Associated Beverages Co. v. P. Ballantine & Sons*, 287 F.2d 261, 265 (5th Cir. 1961); *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332,

It is clear from the preceding discussion, the legal precedents cited, and the undisputed facts of BEC's declining performance in the sale of DeJur products that DeJur is entitled to summary judgment on BEC's claims founded on the federal antitrust laws.[32]

■■■ Another major cause of action advanced by BEC is breach of agreement. BEC admits that no formal written contract between it and DeJur existed at the time of the termination, but it contends that there are sufficient writings to reflect that agreement. Yet, it has not placed these writings in the record or even described their terms.[33] BEC has alleged, however, that its dealership of DeJur products was to continue "for so long as [BEC] adequately and reasonably served and serviced" the Washington, D. C. metropolitan area. Complaint ¶ 7, at 7. Therefore, assuming the existence of a binding agreement and further assuming that inadequate performance was the only reason DeJur could terminate the agreement, that reason existed at the time of this termination. When a dealer's sales decline as dramatically as did BEC's, performance unquestionably has become inadequate. Accordingly, DeJur also is entitled to summary judgment on BEC's claim of breach of agreement.

■■■ BEC's next cause of action is for false representations, although it is not altogether clear what BEC believes those

false representations to have been. It appears that one might have concerned Mr. Witte's employment status with DeJur. BEC states that it was told

> Mr. Witte was only being considered for a position with [DeJur] when he had in fact long since been actually hired to take over the said government sales as part of said scheme.

Complaint ¶ 8. Perhaps another allegedly false representation involved the reason for the termination: DeJur stating it to be principally BEC's poor sales performance and BEC contending that to be merely pretextual, the real reason being its sales of Sony products.

The necessary elements in a cause of action for false representations are that

> the representation of a material fact was made; that such representation was false and known to be false by the party making it, and was made with intent to deceive; and that the party to whom it was made had a right to rely upon it and did rely upon it to his injury or damage.

37 *Am.Jur.2d* Fraud and Deceit § 42, at 66 (1968).

■■■ Applying those elements to the facts of this case reveals the inadequacy of this cause also. First of all, there is no indication that the pertinent facts are material. Materiality is present when the fact

337–38 (4th Cir. 1959); *Leo J. Meyberg Co. v. Eureka Williams Corp.*, 215 F.2d 100, 100 (9th Cir.) (per curiam), *cert. denied*, 348 U.S. 875, 75 S.Ct. 113, 99 L.Ed. 689 (1954); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 915 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

**32.** BEC's complaint had also cited the Robinson-Patman Act, 15 U.S.C. § 13(a) (1970), as a basis for its antitrust allegation. In an earlier order, however, this Court dismissed that cause of action, finding that the complaint did not *contain any allegations sufficient to state a* claim under that provision. Order of January 16, 1978, at 2–4.

**33.** At the hearing on this motion, counsel for BEC also argued that a consent decree between DeJur and the Federal Trade Commission was confirmatory of the BEC–DeJur agreement. He termed this "the single most important doc-

ument in the case" and said it "confirms what the understanding was." Transcript at 18. Under that decree, DeJur agreed not to restrict the manner in which its dealers sold DeJur products, not to prevent its dealers from selling similar products of other manufacturers, and not to take reprisals against any of its dealers. *In re DeJur-Amsco Corp.*, FTC Docket No. C–1787 (Aug. 27, 1970). Clearly, however, BEC has no rights under that decree. It was not a party to it and cannot claim to be a third-party beneficiary of it. In *Holloway v. Bristol-Myers Corp.*, 158 U.S.App.D.C. 207, 485 F.2d 986 (1973), this circuit held "that private actions to vindicate rights asserted under the [FTC] Act may not be maintained." *Id.*, 158 U.S.App.D.C. at 208, 485 F.2d at 987. If that decree has been violated, it is up to the FTC and not plaintiff to bring an action to enforce it.

influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the contract would not have been entered into or the transaction not have occurred.

*Id.* § 178, at 238. If these were false representations, it does not appear that they induced BEC to take any action it otherwise would not have taken or that they discouraged it from acting when it otherwise would have acted. Secondly, there is no indication of what right BEC had to rely on these representations, or more particularly how it did rely on them. Finally, there is no indication as to how these allegedly false representations damaged BEC.[34] In fact, any damages BEC may have incurred were from the termination itself and not from any representations that preceded the termination. Once more then, the facts weighed against the appropriate legal standard demonstrate that DeJur is entitled to summary judgment on this cause of action.

BEC's final cause of action is for interference with business relations and for unfair competition. Again, there have been no specific allegations or facts by BEC as to how this cause arises, only the general statement of the claim.

▇▇▇▇ Interference with business relations is a tort that can arise in two situations. The first is interference with contractual relations. It only arises, however, if there is interference with a contract between the plaintiff and some third party.[35] No such situation is suggested on the facts of this case. Even assuming it was, if the interference is caused by the defendant's breach of his own contract with plaintiff, as BEC's allegations suggest is the case here, that is no basis for this cause of action.[36] The second kind of interference is with a plaintiff's prospective business advantage. In that situation, however, there is the privilege of competition. Therefore, the cause of action becomes virtually the same as that for unfair competition.[37]

▇▇▇▇ Unfair competition is not defined in terms of specific elements, but instead by the description of various acts that would constitute the tort if they resulted in damage. A refusal to deal is not one of these acts.[38] They do include, however, defamation of the plaintiff or disparagement of its goods or business methods,[39] both of which have been generally alleged by BEC. No specific instances of defamation or disparagement have been cited by BEC, although surely it must have had at least some knowledge of such acts before it filed this suit. Moreover, here, too, damages are a necessary element of the cause of action, and there is no suggestion by BEC that it has suffered any harm beyond that allegedly resulting from the termination. That is insufficient, and so DeJur will prevail on this cause as well.

## CONCLUSION

As with any battle, the passions and bitterness generated in this case have been strongly voiced. But now that the battle has been fought and the smoke has settled, it is clear that DeJur leaves the battlefield the victor. As is properly the result in any lawsuit, the side that has prevailed is the one that armed its weapons with facts and not with words, a point more eloquently made by John Adams during his defense of the British soldiers on trial for the Boston Massacre when he remarked:

Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence.

**34.** Unlike some tort actions, there is no provision for nominal damages in an action for false representation. Damages are an essential element, and without them, there is no cause of action. 37 *Am.Jur.2d* Fraud & Deceit § 283, at 379 (1968).

**35.** W. Prosser, *Law of Torts* § 123, at 952–70 (3d ed. 1964).

**36.** *Id.* at 958 (citing *Rosenkoff v. Finkelstein*, 90 U.S.App.D.C. 263, 195 F.2d 203 (1952)).

**37.** *See id.* § 124, at 979–87.

**38.** *Id.* at 979–80; *cf. United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

**39.** W. Prosser, *supra* note 35, at 981.

 

J. Bartlett, *Bartlett's Familiar Quotations* 462b (14th ed. 1968). Accordingly, summary judgment will be entered for DeJur on BEC's complaint. Because of this disposition, the Court will deny DeJur's recent motion to open the record for consideration of documents it has obtained from counterclaim defendant Business Equipment Center of Baltimore.