Arlie Glen SKELTON, Jr., C. G. Haskins, Eugene C. Coleman et al., Plaintiffs,

v.

GENERAL MOTORS CORPORATION, Defendant.

No. 79 C 1243.

United States District Court, N. D. Illinois, E. D.

Oct. 1, 1980.

Charles A. Boyle, William J. Harte, Abraham N. Goldman, Francis E. Goodman, Chicago, Ill., for plaintiffs.

William R. Jentes, Steven J. Harper, Thomas A. Gottschalk, Stephen C. Neal, Garrett B. Johnson, John T. Hickey, Jr., of Kirkland & Ellis, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs, purchasers of General Motors Corporation (GM) automobiles, seek relief under the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act (Magnuson–Moss Act or Act), 15 U.S.C. § 2301 et seq., because of the alleged undisclosed substitution of THM 200 (M29) trans-

missions for THM 350 (M38) transmissions in various 1976 through 1979 models of GM automobiles. Plaintiffs claim that the THM 200 transmission is inferior to the THM 350 and that the substitution has caused violations of written warranty, implied warranty and deceptive warranty provisions of the Act. GM has moved to dismiss the second amended complaint for failure to state a claim upon which relief can be granted.[1]

The complaint alleges that GM has disseminated "brochures, manuals, consumer advertising and other forms of communications" which "expressly represented and warranted" that certain GM automobiles contained "THM 350 ... transmissions, or transmissions of similar quality and performance ... and that they would meet a specified level of performance." Through such communications, GM "implied, warranted and represented" that those models contained such transmissions. Plaintiffs in Count I charge violation of the written warranty and, apparently, implied warranty provisions of the Magnuson–Moss Act. In Count II, plaintiffs claim that the substitution is actionable as a deceptive warranty within the meaning of § 110(c)(2) of the Act, 15 U.S.C. § 2310(c)(2).

The court concludes that there is no private right of action under § 110(c)(2) and that the complaint does not state a claim for breach of an implied warranty. Count I, however, liberally construed, does state a claim for violation of written warranties under § 110(d) of the Act. Federal jurisdiction requires a sales transaction which includes a written warranty within the express statutory terms, but the representations made to purchasers in conjunction with such a warranty are actionable under federal law. The reach of federal law is not to representations made in the market generally but to representations made to purchasers of consumer goods in conjunction with a sales transaction of which the

<hr />

1. This case is related in certain respects to the much–publicized "engine interchange" litigation, which has been before the court of appeals in this circuit on two different occasions. See In Re General Motors Corp. Engine Inter-

change Litigation, 594 F.2d 1106 (7th Cir. 1979); Oswald v. McGarr, 620 F.2d 1190 (7th Cir. 1980). The questions here presented were not considered there.

furnishing of a written warranty, as statutorily defined, is an integral part. Accordingly, the motion is denied as to Count I, and Count II is dismissed.

A literal reading of the Magnuson–Moss Act is only a departure point for giving meaningful content to the statute which has been variously described as "disappointing",[2] "opaque",[3] and a product of "poor drafting".[4] A review of the legislative history gives but limited solace. That review is the legal equivalent of an archeological dig. Various consumer warranty bills were pending before the House and Senate for four years, during which each body defined, discarded, reintroduced and redefined concepts which in some fashion or another are related to the enacted legislation. Some provisions in the Act are vestigial reminders of concepts buried but not totally forgotten during the on–going legislative process. Both proponents and opponents of an expansive interpretation have cited compelling, to them, legislative history only dimly related to the language which finally emerged as law.

Any consideration of the questions presented must begin, then, with the Supreme Court's admonition that "[s]tatutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." *Boys Market, Inc. v. Retail Clerks Union*, 398 U.S. 235, 250, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970).[5]

## I. Written Warranties

The genesis of the Act was Congressional concern about the adequacy of warranty protection for automobile purchasers, documented by FTC investigations in 1968 and 1970. See H.Rep. No. 93–1107, *reprinted in* 1974 U.S.Code Cong. and Admin.News, at pp. 7708–9. The hypothetical consumer had purchased a defective automobile, possessed an impressive warranty document, and had but little hope of real relief. That concern led to a legislative effort to provide meaningful warranty protection for consumers in a mass marketing economy. A consistent concept in the Act and its legislative history, akin to that in the securities laws, is that full disclosure will result in informed choices, or at least that the reach of federal action should mandate full disclosure so as to permit informed choice. See Eddy, *Effects of the Magnuson–Moss Act upon Consumer Product Warranties*, 55 North Car.L. Rev. 835, 874 (1977). The history of the Act was, if not shaped, profoundly influenced by the inadequacies of the familiar formal consumer warranty, after described as "the paper with the filigree border."[6]

Equally apparent from the Act and its legislative history is the Congressional reluctance to sanction a sweeping preemption of the law of commercial transactions traditionally the preserve of each of the fifty states but in a sense federalized by the widespread enactment of the Uniform Commercial Code. The Magnuson–Moss Act is not a federal "truth in advertising" law. It has as its essential purpose truth in express warranty disclosure, but both in language and legislative history it recognizes that what is in the paper with the filigree border cannot be wholly divorced from what has influenced the consumer in a mass market-

---

2. Eddy, *Effects of the Magnuson–Moss Act Upon Consumer Product Warranties*, 55 North Car.L.Rev. 835, 877 (1977) [hereinafter "Eddy"].

3. *Emerging Issues Under the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act*, 45 Antitrust L.J. 72, 90 (1976) [hereinafter "Seminar"].

4. Schroeder, *Private Actions Under the Magnuson–Moss Warranty Act*, 66 Cal.L.Rev. 1, 3 (1978) [hereinafter "Schroeder"].

5. See *F. T. C. v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968) (Court interprets statute while conceding it is "by no means . . . an exemplar of legislative clarity"). See generally L. Hand, *The Bill of Rights* at 19–30; Friendly, *The Gap in Lawmaking–Judges Who Can't and Legislators Who Won't*, 63 Colum.L.Rev. 787 (1963).

6. H.Rep. No. 13–1107, *supra*, 1974 U.S.Code Cong. and Admin.News at 7703.

ing economy. What then is now a federal claim and what is the traditional state lawsuit based upon the Uniform Commercial Code?

■ The key to understanding the scope and effect of the Magnuson–Moss Act is interpreting the phrase "written warranty", which appears at several different places in the statute with somewhat different meanings. The Act initially defines a written warranty as:

(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

15 U.S.C. § 2301(6). As with the Uniform Commercial Code,[7] a written warranty under this definition is a specific type of "affirmation", "promise", or "undertaking",

though the Act's definition is substantially narrower than the Code's.

■ A written description of the size or type of a transmission does not constitute a written warranty as defined by this section. The plaintiffs attempt to fit such a promise under subsection (A) of this section, contending that it "relates to the nature of the material or workmanship and affirms or promises that such material or workmanship . . . will meet a specified level of performance." However, the plaintiffs ignore the requirement that the promise of a "specified level of performance" must be "over a specified period of time." To constitute a written warranty under this provision a warranty must be limited in duration; a representation, for example, that a transmission will perform adequately for three years would constitute a written warranty,[8] but not simply a statement that an automobile contains a certain type of transmission.

■ The Federal Trade Commission supports this construction:

The Act imposes specified duties and liabilities on suppliers who offer written warranties on consumer products. Certain representations, such as energy efficiency ratings for electrical appliances, care labeling of wearing apparel, and other product information disclosures may be express warranties under the Uniform Commercial Code. However, these disclosures alone are not written warranties under the Act. Section 101(6) provides

7. Section 2–313 of the Uniform Commercial Code describes express warranties as follows:

Express Warranties by Affirmation, Promise, Description, Sample

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express

warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

8. The representations would also have to be made "in connection with the sale" and would have to become "part of the basis of the bargain" to constitute a written warranty under this section of the statute. 15 U.S.C. 2301(6). See Schroeder, *supra* n.4, at 14–16.

that a written affirmation of fact or a written promise of a specified level of performance must relate to a specified period of time in order to be considered a 'written warranty.' A product information disclosure without a specified time period to which the disclosure relates is therefore not a written warranty.[9]

16 C.F.R. § 700.3 (1980). Therefore, according to both the text of the statute and the interpretation of the agency charged with its enforcement, the plaintiffs assertion that all written representations which would be express warranties under the Uniform Commercial Code constitute written warranties under the Magnuson–Moss Act is mistaken.[10]

■■ To the extent that the plaintiffs rely on broad promises or representations distributed to the general public through advertising, the complaint also fails to plead the existence of a written warranty under § 101(6). Several provisions in the Magnuson–Moss Act strongly suggest that descriptions of products contained in general advertising are generally not written warranties within the meaning of § 101(6). Section 103 of the Act, for example, requires that every written warranty conspicuously disclose whether it is "full" or "limited" as those terms are defined by the Act. 15 U.S.C. § 2302. Congress certainly did not intend that every written advertisement should include a conspicuous heading stat-

ing whether it is "full" or "limited"–in fact, the terms do not make sense as applied to most advertising. See 15 U.S.C. § 2304. The regulations conclude, simply:

> The Commission encourages the disclosure of product information which is not deceptive and which may benefit consumers, and will not construe the Act to impede information disclosures in product advertising or labeling.

16 C.F.R. § 700.3 (1980). The fact that a manufacturer has distributed written advertisements describing his products does not make him a "warrantor" under the Act, nor does it trigger the Act's extensive regulatory scheme designed for more formal warranties. The plaintiff's complaint, because it fails to distinguish between descriptions of transmissions in general advertising and time–bound promises presented in connection with the sale of specific cars, pleads more than a breach of a written warranty under the literal terms of §§ 101(6) and 110(d)(1).[11]

GM contends that analysis of this case should end at this point, that the statute means what it says when it defines written warranties, and that state law provides the exclusive remedy for breaches of express warranties which do not fulfill the requirements of § 101(6). If the Act itself consistently adhered to the narrow definition of written warranty in § 101(6), this argument

---

**9.** Plaintiffs make much of the fact that the Federal Trade Commission has initiated proceedings against GM because of the alleged transmission switch. It is noteworthy that the Commission is proceeding under its general powers to investigate and to provide relief from deceptive practices under the Federal Trade Commission Act, not under the Magnuson–Moss Act.

**10.** See Eddy, *supra* n.2, at 853–54; Note, *Consumer Product Warranties Under the Magnuson-Moss Warranty Act and the Uniform Commercial Code*, 62 Cornell L.Rev. 738, 744–46 (1977). Interestingly, if GM had represented that the transmission would "perform like a THM 350 transmission for the life of the transmission", there is little question that such a statement would constitute a warranty under § 101(6).

**11.** It is not clear whether all advertising is exempt from the definition of "written warran-

ty" in § 101(6). The definition requires that an "affirmation of fact or written promise" must be made "in connection with the sale of a consumer product" to be a written warranty. An earlier version of the Act defined written warranty in terms of representations made "at the time of sale." S.Rep. 356, 93d Cong., 1st Sess., § 101(11) (1973), 119 Cong.Rec. 969. There is some suggestion in the legislative history and Federal Trade Commission treatment of other sections of the statute that at the very least a formal warranty presented in newspapers or other advertising is covered by the Act if it meets the other requirements of § 101(6). See Joint Explanatory Statement of the Committee of Conference, S.Conf.Rep. No. 93–1408 and H.R.Conf.Rep. 93–1606, 93d Cong., 2d Sess. (1974), 1974 U.S.Code Cong. and Admin. News, pp. 7759–60. See generally Schroeder, *supra* n.4, at 14–16 & n. 79.

might be persuasive. GM is correct that a transaction must involve some representations constituting written warranties under § 101(6) to be covered by the Act. Its claim that the Act provides a cause of action only for breaches of such representations, however, fails to take into account ambiguities in the statute or adequately to explain its legislative history and the range of consumer problems it was designed to address.

■ The Act itself suggests several different possible meanings of the phrase "written warranty". The definition in § 101(6) is, by itself, relatively clear. As discussed above, a written warranty under subsection (A) of § 101(6) is a particular type of "affirmation" or "promise". Other provisions of the Act, however, do not employ this definition. For example, the next section of the statute implies that a written warranty is not a particular type of promise or affirmation, but rather a document containing such representations along with others. Section 102 authorizes the Federal Trade Commission to promulgate rules requiring "inclusion *in the written warranty*" of various explanations of the rights of the consumer, including such statements as a "brief, general description of the legal remedies available to the consumer." 15 U.S.C. § 2302(a). A description of the legal status of the consumer is not a written warranty under the narrow definition of § 101(6), but Congress apparently intended, if a warrantor distorts or fails to comply with such a description which has been included in a document also containing § 101(6) warranties, that this failure would be actionable as a breach of a written warranty. A written warranty is not just a particular type of "promise" or "affirmation" but a type of document or written contract as well.

This second definition of written warranty flows from the typical transaction which Congress had in mind in passing the Magnuson–Moss Act, in which the consumer receives "the paper with the filigree border

bearing the bold caption 'Warranty' or 'Guarantee'." H.Rep. No. 13–1107 on H.R. 7917, 93d Cong. 2d Sess. (1974), 1974 U.S. Code Cong. & Admin.News, p. 7708. A formal warranty of this kind is not the only type of written warranty covered by the Act, but the regulatory scheme suggested by §§ 102–104, which the Federal Trade Commission has developed in more detail, is directed largely at such documents.[12] If formal, written warranties were all that Congress had in mind in permitting private suits for breach of written warranties, then GM would be mistaken in arguing that a description of the size of a transmission is never actionable under the Act. Instead, this case would turn on whether the representation was made in a formal warranty or in written documents which could fairly be construed as part of a formal warranty. One questions what the position of GM might be if its "filigree border" warranty stated that the automobile possessed a THM 350 transmission which was defect free and was warranted for a stated time or number of miles, when in fact the automobile had a different and substantially inferior mechanism which could, however, be expected to operate with reasonable efficiency through, but not much beyond, the warranty period.

■ Other sections of the statute create additional ambiguities. Section 110(c)(2) (B), for example, defines a "deceptive warranty" as "a written warranty created by the use of such terms as 'guaranty' or 'warranty', if the terms and conditions of such warranty so limit its scope and application as to deceive a reasonable individual." 15 U.S.C. § 2310(c)(2)(B). Apparently, a written warranty can be "created" by the use or misuse of the words "guaranty" or "warranty", even if the document using these terms does not include representations which constitute warranties under

---

**12.** See 16 C.F.R. § 701.1(i) (1980) (defines the phase "on the face of the warranty", and clearly indicates that a warranty is a type of document, at least for purposes of the disclosure provisions of the regulations); *FTC Staff Explains Details of Magnuson–Moss Warranty Act*, Antitrust & Trade Reg.Rep. (BNA) at F–2 & F–5 (1976).

§ 101(6).[13] Section 103(b) of the Act adds further to the confusion by stating that the sections of the statute regulating the contents of written warranties should not be interpreted to apply "to statements or representations which are similar to expressions of general policy concerning customer satisfaction and which are not subject to any specific limitations". 15 U.S.C. § 2303(b). If GM's narrow definition of written warranties were correct, this provision would be unnecessary; yet the text and the legislative history of this section indicate a substantial concern with the possibility that broad representations such as "satisfaction guaranteed or your money back" would constitute written warranties under the Act. See H.Rep. 93–1107, *supra*, 1974 U.S.Code Cong. & Admin.News at 7719.[14] Congress must have anticipated in certain circumstances that written representations having little connection with documents containing § 101(6) warranties might still be covered by the Act.

If the statute itself reflects some confusion over the meaning of the phrase "written warranty", the legislative history is even more puzzling. Throughout many of the Congressional hearings and floor debates on proposed versions of the Act, the legislators assumed that there were two types of express warranties: oral and written.[15] The discussion indicated little awareness that the statute on its face regulated only a narrow range of written, express warranties as the term is used in the Uniform Commercial Code.[16] Some of this confusion probably resulted from the fact that earlier forms of the statute, including the version first passed by the Senate, contained a separate provision for breach of express warranties generally. See S.356, 119 Cong.Rec. 29491 (1973). Express warranties and implied warranties were treated together in these earlier bills, whose principal effect was to authorize awards of costs and expenses, including attorneys' fees, to consumers who "prevail[ed] in any suit or proceeding for breach of an express or implied warranty ..." *Id.*[17] The bills mirrored the definition of express warranties in § 2–313 of the Uniform Commercial

---

**13.** The Federal Trade Commission has adopted this interpretation. See Schroeder, *supra* n.4, at 9, and materials cited.

**14.** See also S.Rep. No. 93–151 on S.356, 93d Cong., 1st Sess. (1973) at 17; Seminar, *supra* n.3, at 94–95.

**15.** See, e. g., Hearings Before the Subcommittee on Commerce & Finance of the House Committee on Interstate and Foreign Commerce, 93d Cong., 1st Sess. at 116, 168–69 & 321–24; see also 119 Cong.Rec. 29485 (1973) (discussing proposed amendment to the bill, Rep. Moss implied that the principal distinction in the Act is between express warranties which are oral and those which are in writing; no indication appears there that only a narrow range of express warranties under the Uniform Commercial Code which are in writing actually constitute written warranties under the Act); Joint Explanatory Statement of the Committee of Conference, *supra*, 1974 U.S.Code Cong. & Admin.News at 7758. This ambiguity in the statute and the legislative history apparently led some commentators to believe that all express warranties which are in writing are covered by the private remedy sections of the Act. See, e. g., Smith, *The Magnuson–Moss Warranty Act: Turning the Tables on Caveat Emptor*, 13 Cal. Western L.Rev. 391, 421 (1977).

**16.** At other times the legislators focused on problems relating to formal warranties, but again often failed to indicate that § 101(6) in its face includes many representations not necessarily contained in formal warranties, and excludes some documents "with the filigree border." H.Rep. No. 13–1107, *supra*, 1974 U.S. Code Cong. & Admin.News at 7703.

**17.** Though the bill appeared to provide a federal right to sue for breach of express and implied warranties, the purchaser of a consumer product could only bring such suits in state courts. S.356, § 110(b), 119 Cong.Rec. 29491 (1973). The net effect of these sections of the statute, therefore, flowed largely from the provisions for costs, expenses and attorneys' fees.

The definition of written warranty contained in this bill was a lesson in statutory indirection. The bill first defined a "warranty in writing" or "written warranty" as a "warranty in writing against defect or malfunction of a consumer product." It then defined a "warranty in writing against defect or malfunction of a consumer product" in essentially the same way as the final version of the Act defined "written warranty". *Id.* §§ 101(10) & 101(11).

Code,[18] including the Code's provision that any "description of a consumer product which is made part of the bargain creates an express warranty that the consumer product shall conform to that description." *Id.*

The House rejected this approach and adopted a version of the Act which deleted any reference to express warranties, though retaining a cause of action for breach of implied warranties. The Conference Committee endorsed the House version of the bill. However, the Committee believed that in rejecting the Senate bill it only prevented attorney's fees awards for breaches of *oral* warranties. The Committee report explained:

> The Senate bill afforded reasonable attorney's fees to a consumer who successfully sued for the breach of an express oral warranty. The House amendment did not provide reasonable attorney's fees in that situation. The conferees adopted the House approach, but stated that they would reexamine the issue if oral warranties became more prevalent.

Joint Explanatory Statement of the Committee of Conference, *supra*, 1974 U.S.Code Cong. & Admin.News at 7758. The Conference Committee approached the express warranty provisions of the Senate bill as applying only to oral, express warranties, apparently assuming that the private remedy for breach of "written warranties" already adequately covered the field of written, express warranties as defined by the Uniform Commercial Code. House subcommittee hearings discussing this issue also support this conclusion: the intent of the House in eliminating the Senate remedies for breach of express warranties was largely to avoid the difficult problems and factual uncertainties of proof and liability connected with oral warranties, not to restrict

the range of written representations protected by the Act.[19] The statute thus contains yet another ambiguity—the phrase written warranty as used in § 110(d) of the Act, authorizing private suits for breach of written warranties, is apparently intended to have a broader scope than that suggested by the definition in § 101(6).

Resolving these ambiguities requires examining the purposes of the Magnuson–Moss Act and attempting to interpret the statute as a whole. Senator Magnuson suggested four problems the statute was designed to address when he introduced it to the Senate. First, he stated, the statute was "designed to promote consumer understanding. Far too frequently there is a paucity of information supplied to the consumer about what in fact is offered him in that piece of paper proudly labeled 'warranty.'" 119 Cong.Rec. 968 (1973). Second, he continued, "there is a great need to insure certain basic protection for consumers purchasing consumer products which have written warranties," and in particular to deter "the disclaimer of implied warranties when the supplier of a consumer product guarantees his products in writing." Third, because "enforcement of a warranty through the courts is prohibitively expensive, there exists no currently available remedy for consumers to enforce warranty performance." The statute attempts to remedy that problem in part by "providing reasonable attorneys' fees and court costs to successful consumer litigants." Fourth, he concluded, there is a "need to stimulate the production of more reliable products," by requiring clear disclosure of what the warrantor is promising, so that a consumer can get some idea of the quality of products by examining the scope and duration of these written promises. *Id.*[20]

---

**18.** See *supra*, n.7.

**19.** See, e. g., Hearings Before the Subcommittee on Commerce & Finance, *supra* n.15, at 116, 168–9, 319–21 & 329. Use of the term "alone" in the regulations adopted by the FTC also supports this court's interpretation of the Act. 16 C.F.R. § 700.3 (1980) (quoted *supra*).

**20.** The Act has been described as adopting essentially a "disclosure approach" to the problems associated with written warranties. Under this approach the theory is "the market will unerringly correct the abuse without the need for direct intervention", if honest disclosures of the scope and effect of warranties are required. Eddy, *supra* n.2, at 874.

 Two guiding principles emerge from the legislative discussion of the Act. The statute was not designed completely to supplant the state law of warranties and sales, but rather was intended primarily to regulate transactions involving written, usually formal, warranties under the narrow definition of § 101(6).[21] Further, in such transactions the Act not only regulates the contents and effect of the warranty document itself, but is also designed to provide a basic level of honesty and reliability to the entire transaction. Therefore, the Act requires certain written representations, generally the "paper with the filigree border", which trigger the Act's protections. Other written promises presented in connection with the same transaction should also be enforceable as part of the "written warranty."[22]

Any other result would be contrary to the goals of the statute to "promote consumer understanding" and "insure certain basic protection for consumers purchasing consumer products which have written warranties." 119 Cong.Rec. 968, quoted *supra*. In a typical automobile sale, a purchaser receives a pile of written documents. A formal warranty can be presented along with, or even contained inside, a brochure or manual.[23] As part of the same transaction, the purchaser may examine the sticker or label on the automobile and other printed material supplied in connection with the sales transaction. There is little reason to believe that a purchaser will distinguish between written representations made in the formal warranty and those made in the accompanying material.[24] If a warrantor describes in the sales literature the type of transmission he is selling and states in the text of a formal warranty that the quality of the transmission is warranted for a particular time, the effect on the consumer will likely be the same as if the warrantor includes the description in the formal warranty document.[25] There is nothing in the legislative history of the Act to suggest that Congress intended this kind of artificial distinction to determine the rights and remedies of the consumer.

 Construing the Act as providing a remedy for all written promises presented in connection with the sale of a formally warranted product avoids arbitrary distinctions between state and federal remedies. This interpretation is also consistent with the policy suggested by the statute's treatment of implied warranties. The original purpose of regulating implied warranties under the Act was to prevent the practice of warrantors giving consumers written warranties which, although appearing to promise the moon, actually had the effect of diminishing their legal rights by disclaiming implied warranties. Section 108 of

---

21. The protections of the Act may also be triggered by the use or misuse of the words "warranty" or "guaranty". See text and note at n.13, *supra*.

22. This court is not unmindful that allegations of representations made in advertising to consumers generally, which may rise to the level of express warranties under state law, may lead to pendent jurisdiction claims in a Magnuson–Moss action. Those do not, however, invoke federal question jurisdiction under the Act.

23. See Antitrust & Trade Reg. Rep. (BNA), *supra* n.12, at F–5; 16 C.F.R. § 701.1 (1980); Schroeder, *supra* n.4, at 15.

24. See Antitrust & Trade Reg. Rep. (BNA), *supra* n.12, at F–5 (regulations permit printing a formal warranty "in a use and care manual, or directly on the product itself."); Schroeder, *supra* n.4, at 15 ("When the manufacturer expressly gives a written warranty intended to run with the product to the consumer, as in the case of an express warranty contained in an instruction manual, there should be no problem in recognizing the right of the consumer to enforce the warranty.")

Under state law, the formal warranty in such a transaction may be considered part of the same written contract, and even part of the same document, as the brochure or manual for purposes of the parol evidence rule or the statute of frauds. See U.C.C. §§ 2–201; 2–202. There is therefore no principled reason under state law to limit a written warranty to the "paper with the filigree border".

25. Apparently following this type of reasoning, the court of appeals in the "engine interchange" litigation noted, simply, that "the transmissions were not those warranted," and implied that whether such a representation was contained in the formal warranty was irrelevant. *In Re General Motors Corp. Engine Interchange Litigation, supra*, 594 F.2d at 1132 n.44.

the Act responds to this problem by restricting the legal effect of these disclaimers. 15 U.S.C. § 2308.[26] But Congress did not simply modify state law in this respect; instead, section 110 of the Act creates a broad federal cause of action for breach of implied warranties, at least for consumers who receive written warranties. 15 U.S.C. § 2310(d)(1).[27] The purpose of this provision is to "insure a certain basic protection for consumers purchasing consumer products which have written warranties." 119 Cong.Rec. 968 (1973). Congress, therefore, indicated that although the Magnuson–Moss Act only regulates transactions involving written warranties as the term is narrowly defined in § 101(6), once a consumer is involved in such a transaction there is a policy of providing federal remedies beyond the four corners of the formal warranty. Permitting a consumer to sue a warrantor for violating any written representations made in connection with the sale of the same product which is covered by a formal warranty furthers this goal. A narrower reading of the Act would elevate form over substance and would frustrate the purpose of the legislature.

## II. *Implied Warranties*

The Magnuson–Moss Act authorizes private actions by "consumers" who are "damaged by the failure of a supplier, warrantor or service contractor to comply with" an implied warranty. 15 U.S.C. § 2310. The Act looks to state law to determine the scope of implied warranties. 15 U.S.C. § 2301(7). As the defendant points out, the implied warranty at issue in this case is the implied warranty of merchantability contained in U.C.C. § 2–314.[28] The defendant concedes that it is a "merchant" within the meaning of the Uniform Commercial Code, and that the plaintiffs have alleged a sale of goods triggering the protections of the implied warranty of merchantability. See generally *Burrus v. Itek Corp.*, 46 Ill.App.3d 350, 4 Ill.Dec. 793, 360 N.E.2d 1168 (3d Dist. 1977).

■ The implied warranty of merchantability does not impose a general requirement that goods precisely fulfill the expectations of the buyer. Instead, it provides for a minimum level of quality–that the goods "are fit for the ordinary purposes for which such goods are used." U.C.C. § 2–314(2)(c). Automobiles are designed for driving, and therefore the question in this case is whether the GM vehicles at issue were fit for that purpose. The Illinois Appellate Court has observed:

Fitness for the ordinary purpose of driving implies that the vehicle should be in a

---

26. Section 2308 provides:

 (a) Where written warranty is made or service contract is entered into, no supplier may disclaim or modify (except as provided in subsection (b)) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

 (b) Where implied warranties are limited in duration to duration of written warranty. For purposes of this title (other than section 104(a)(2)) implied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty.

 (c) Violative disclaimer, modification, or limitation ineffective. A disclaimer, modification, or limitation made in violation of this

section shall be ineffective for purposes of this title and State law.

27. This section appears to authorize awards of attorneys' fees to *any* "consumer who is damaged by any supplier ... to comply with any obligation under ... an implied warranty." However, the legislative history of this provision suggests that such awards might be limited to consumers who also received written warranties as defined by § 101(6). See H.Rep. No. 93–1107, *supra*, 1974 U.S.Code Cong. & Admin.News at 7722; 119 Cong.Rec. 968 (1973) (statement of Sen. Magnuson).

28. Breach of the implied warranty of fitness for a particular purpose is not involved here, because the plaintiffs' complaint does not include any special reference to use of the cars purchased by the plaintiffs beyond the ordinary purposes for which the cars were designed. See U.C.C. § 2–315; H.Rep. No. 93–1107, *supra*, 1974 U.S.Code Cong. & Admin.News at 7707.

safe condition and substantially free of defects. It should be obvious that any car without an adequate transmission and proper brakes is not fit for the ordinary purpose of driving.

*Overland Bond and Investment Corp. v. Howard,* 9 Ill.App.3d 348, 292 N.E.2d 168, 172–73 (1st Dist. 1972). In *Overland Bond* the transmission fell out of the car on one occasion and the brakes failed on another, each time while the plaintiff was driving on an expressway. Since the car was clearly unsafe, the court concluded that the defendant had breached the implied warranty of merchantability.

 The complaint here describes a less extreme situation. The plaintiffs allege that the substitution of THM 200 transmissions was "a material change" in the cars, and that these transmissions are "more expensive to maintain" and "less desirable to the purchasing public than THM 350 (M38) Transmissions." Second Amended Complaint at 5. These statements fall short of alleging a breach of implied warranties, since they do not suggest that the cars were unfit for driving or below a minimally acceptable standard of quality.

### III. *Deceptive Warranties*

The plaintiffs also contend that GM gave them deceptive warranties in violation of § 110(c) of the Act, which provides:

(1) The district courts of the United States shall have jurisdiction of any action brought by the Attorney General (in his capacity as such), or by the Commission by any of its attorneys designated by it for such purpose, to restrain (A) any warrantor from making a deceptive warranty with respect to a consumer product, or (B) any person from failing to comply with any requirement imposed on such person by or pursuant to this chapter or from violating any prohibition contained in this chapter. Upon proper showing that, weighing the equities and considering the Commission's or Attorney General's likelihood of ultimate success, such

action would be in the public interest and after notice to the defendant, a temporary restraining order or preliminary injunction may be granted without bond. In the case of an action brought by the Commission, if a complaint under section 45 of Title 15 is not filed within such period (not exceeding 10 days) as may be specified by the court after the issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect. Any suit shall be brought in the district in which such person resides or transacts business. Whenever it appears to the court that the ends of justice require that other persons should be parties in the action, the court may cause them to be summoned whether or not they reside in the district in which the court is held, and to that end process may be served in any district.

(2) For the purposes of this subsection, the term "deceptive warranty" means (A) a written warranty which (i) contains an affirmation, promise, description, or representation which is either false or fraudulent, or which, in light of all the circumstances, would mislead a reasonable individual exercising due care; or (ii) fails to contain information which is necessary in light of all of the circumstances, to make the warranty not misleading to a reasonable individual exercising due care; or (B) a written warranty created by the use of such terms as "guaranty" or "warranty", if the terms and conditions of such warranty so limit its scope and application as to deceive a reasonable individual.

15 U.S.C. § 2310(c).

The plaintiffs concede that this provision expressly authorizes suits only for equitable relief by the Attorney General or the Federal Trade Commission. They argue, however, that the statute impliedly creates a cause of action for damages by consumers who rely on deceptive representations in a warranty.[29]

---

**29.** The question whether the statute expressly provides a private cause of action for deceptive

warranties is not as clear as the parties in this case seem to believe. Section 110(d)(1) autho-

■ As the Supreme Court has recently stated, "[t]he question of the existence of a statutory cause of action is, of course, one of statutory construction.... And as with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). The structure of the Act itself suggests that the set of rights and remedies which Congress established should not include private damage suits against distributors of deceptive warranties. Unlike *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the statutory provision at issue in this case does not contain a broad description of the conduct it is attempting to regulate followed by an entirely separate, and apparently incomplete, description of some of the remedies available; here the rights and remedies are substantially intertwined. Congress neither expressed nor implied a general policy of supplanting state law fraud remedies through a broad prohibition of deceptive warranties. Instead, § 110(c) directs only the Attorney General or the Federal Trade Commission to bring lawsuits–and even

they are authorized only to bring actions to "restrain" deceptive warranties, and not suits for money damages.

Inferring a private cause of action for deceptive warranties would also interfere with the policies suggested by other provisions of the Act. One of the purposes of the statute as a whole is to "prevent deception" in the marketing of consumer products. 15 U.S.C. § 2302. However, the Act attempts to accomplish this goal without unduly discouraging or confusing businesses which choose to provide written warranties. To accommodate the needs of consumers and warrantors, the Act creates a regulatory scheme consisting largely of rules issued by the Federal Trade Commission after having provided all concerned an opportunity to comment.[30] Commission regulations attempt to supply a relatively clear set of guidelines so that warrantors will have some notion of the practices which the Act forbids. To assure compliance with these guidelines, the Act provides a broad set of remedies for consumers who are "damaged" by warrantors who fail to comply with the Act, with FTC regulations,[31] or with the terms of a written warranty. 15 U.S.C. § 2310(d)(1). It would upset the

rizes consumers to sue for failure to comply with "any obligation under this chapter". The avoidance of deceptive warranties is arguably a requirement of § 110(c) of the Act, which would mean that consumers could sue suppliers of deceptive warranties. However, the wording of § 110(c) suggests that Congress did not intend the deceptive warranties provisions to be considered obligations "under" the statute. Subsection 1 of § 110(c) authorizes the Attorney General or the Commission to sue to restrain:

(A) any warrantor from making a deceptive warranty with respect to a consumer product, *or* (B) any person from failing to comply with any requirement imposed on such person by or pursuant to this chapter or from violating any prohibition contained in this chapter.

15 U.S.C. § 2310(c)(1) (emphasis added). This provision suggests a distinction between the prohibition of deceptive warranties and violation of "any requirement" under the Act. The wording of the subsection indicates that deceptive warranties are not violations of "obligations under" the Act in suits by the Government, and are not covered by the private reme-

dies section of the statute. See generally Schroeder, *supra* n.4, at 22.

The defendant also criticizes the complaint because it fails to allege that the plaintiffs provided GM with a "reasonable opportunity to cure" the transmission problem as required by 15 U.S.C. § 2310(e). The complaint does refer, however, to "defendant's failure or refusal to cure" the alleged defects in the transmissions. Complaint ' 12. At this early stage, before there has been any inquiry into the appropriateness of class representatives, this broad allegation is sufficient.

30. For an example of the extensive exchange of information between the Commission and various warrantors and consumer groups, see Antitrust & Trade Reg. Rep. (BNA), *supra* n.12, at F–1–G–4.

31. Section 110(d)(1) does not explicitly authorize private suits for breaches of Commission regulations promulgated under the Act, but the statutory scheme strongly suggests that the reference to private suits for failure to comply with "any obligation under this chapter" includes the regulations. See Schroeder, *supra* n.4, at 24–25.

structure of this statutory and regulatory scheme if a warrantor who carefully complied with the Act and the Commission guidelines could nevertheless be slapped with a large consumer damage action under the deceptive warranty provisions of the statute. See *Touche Ross & Co., supra*, 442 U.S. at 570–74, 99 S.Ct. at 2486–2488. See generally *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975).

Congress also intended that the deceptive warranty section of the Magnuson–Moss Act be read against the background of the Federal Trade Commission Act,[32] 15 U.S.C. § 41 *et seq.* Indeed, the subsection authorizing the Commission to restrain distribution of deceptive warranties explicitly refers to the Federal Trade Commission Act, and the Commission has incorporated regulations it had already adopted under the latter statute as its initial approach to deceptive warranty practices. 16 C.F.R. § 239 (1980). The Trade Commission Act gives the FTC broad power to prohibit "unfair or deceptive acts or practices". 15 U.S.C. § 45. Though at the time Congress was considering the Magnuson–Moss Act the issue was far from clear, the Commission took the position that it already had the power to regulate deceptive warranties and advertisements, and in the past several years that position has proven correct.[33] The deceptive warranty section of the Magnuson–Moss Act is, therefore, largely an effort by the legislative draftsmen to make sure that the statute did not conflict with earlier statutes and to clarify the fact that the Commission had the power to bring suits for injunctive relief to deter at least one category of deceptive acts. The subsection is, in a sense, simply an unnecessary amendment to the Trade Commission Act.

Courts have consistently held that the Federal Trade Commission Act, as amended, does not impliedly create a private cause of action for unfair or deceptive practices. For example, in *Holloway v. Bristol–Meyers Corp.*, 485 F.2d 986 (D.C.Cir. 1973), the court of appeals contrasted suits by consumers injured by deceptive practices with private antitrusts suits explicitly authorized by the Clayton Act. The court observed that the "focus of the Trade Commission Act was a highly specialized administrative body to which Congress delegated a wide range of visitorial powers...." *Id.* at 991 Judge Leventhal, writing for a unanimous panel, pointed out: "Congress ... felt the agency's expertise in making concrete the proscriptions of the 1914 Act against 'unfair methods of competition' rendered the FTC particularly well suited to the responsibility of giving life to the broad standard of 'deceptiveness' as applied to advertising." *Id.* at 995–96. He distinguished other cases in which courts, in an effort to accomplish the purposes of a statute, had inferred private rights of action:

> We are considering an Act in which ends and means, the social ends to be fostered and the administrative means of achieving those objectives, are inseparably interwoven into a unified and comprehensive statutory fabric. Both are the product of a legislative balance which took into account not only consumer protection but also interests of the businesses affected, with particular concern for tempered enforcement, the orderly development of commercial standards, and freedom from multiplicious litigation.

*Id.* at 997. The court concluded that a "fair reading of the statute and its legislative history evidences a plain intent by Congress to make the administrative program for enforcing the Federal Trade Commission Act an exclusive one". *Id.* at 1002.

Similar reasoning suggests that the deceptive warranty provisions of the Magnu-

---

**32.** In fact, Title II of the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act was a broad revision of the powers of the Commission to regulate deceptive practices. See Joint Explanatory Statement of the Committee of Conference, *supra*, 1974 U.S.Code Cong. & Admin.News at 7761–7775.

**33.** See Hearings Before the Subcommittee on Commerce & Finance, *supra* n.15, at 87 (statement of Mr. Engman). See generally *Warner–Lambert Co. v. F. T. C.*, 562 F.2d 749, *cert. denied* 435 U.S. 950, 98 S.Ct. 1575, 55 L.Ed.2d 800 (1977).

son–Moss Act do not imply that there should be a private cause of action against suppliers of deceptive warranties. The term "deceptive" is ambiguous, and is best defined initially by the administrative agency charged with interpreting the Act.[34] In addition, the conduct which Congress was attempting to regulate and the methods it authorized are "inseparably intertwined" in the statute. *Id.* at 997. Inferring a new cause of action in this context would disrupt the statutory framework and needlessly intrude into state law and administrative discretion.[35]

Since Count II of the plaintiffs' second amended complaint is based entirely on the deceptive warranty section of the Act, and since it does not distinguish between deception in written warranties within the definition of § 101(6) and other deceptive representations, this court concludes that Count II must be dismissed.

For the reasons stated above, the defendant's motion to dismiss is denied as to Count I and granted as to Count II.

**34.** See H.Rep. 93–1107, *supra*, 1974 U.S.Code Cong. & Admin.News at 7727.

**35.** However, the plaintiffs may not be entirely without a remedy under the explicit terms of the statute itself. Subsection 110(d)(1) authorizes private suits by consumers who are "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter...." 15 U.S.C. § 110(d)(1). One of the obligations imposed on warrantors under the Act is that they "fully and conspicuously disclose in simple and readily understood language the terms and conditions" of written warranties. 15 U.S.C. § 2302(a). The Commission has interpreted

this section to require, among other things, that a written warranty include a "clear description and identification of products, or parts, or characteristics, or components or properties covered by and, where necessary for clarification, excluded from the written warranty." 16 C.F.R. § 701.3(a)(2) (1980). If GM warranted the quality of its transmissions without disclosing that its "characteristics" or "properties" were different than the consumer reasonably expected, such an omission might violate this regulation. However, except for a passing citation in the plaintiffs' memoranda, the parties have not raised this issue, and the complaint is not directed at this provision.